**SWEET HOME CHAPTER OF COMMUNITIES FOR A GREAT OREGON, et al., Plaintiffs**

v.

**Manuel LUJAN, Jr., Secretary of the Interior, John F. Turner, Director, U.S. Fish and Wildlife Service, Defendants.**

Civ. A. No. 91–1468.

United States District Court,
District of Columbia.

May 29, 1992.

John A. MacLeod, Crowell & Moring, Washington D.C., for Sweet Home Chapter of Communities for a Great Oregon.

Jean Eva Williams, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, D.C., for Manuel Lujan, Jr.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Plaintiffs are various organizations, businesses and individuals, who depend directly or indirectly on the timber industry in the Pacific Northwest and in the Southeast for their livelihood. They challenge two regulations promulgated by the Secretary of the Interior ("the Secretary") as contrary to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544 (1988). They also claim that one of these regulations is void for vagueness. Currently pending before the Court are the parties' cross-motions for summary judgment. The parties agree that there are no genuine disputes of material fact and that this case raises purely legal issues. After careful consideration of the submissions of the parties and the entire record herein, and for the reasons outlined below, the Court will grant defendants' motion for summary judgment and deny plaintiffs' motion for summary judgment.

## REGULATORY AND FACTUAL BACKGROUND

The Endangered Species Act, 16 U.S.C. §§ 1531–1544 (1988), was enacted by Congress in 1973 to provide a program for the conservation of endangered species and threatened species and for the preservation of their ecosystems. 16 U.S.C. § 1531(b). Section 4 of the ESA directs the Secretary to designate species of fish, wildlife, or plants as "endangered" or "threatened" in accordance with certain procedures. 16 U.S.C. § 1533(a)(1). The Secretary is also empowered to designate "critical habitat" for such listed species and to develop recovery plans for their survival. 16 U.S.C. §§ 1533(a)(3), 1533(f).

The ESA prohibits certain activities with respect to species that are designated as endangered or threatened. Section 7(a)(2) of the ESA, which applies only to federally-authorized actions, requires all federal agencies to insure that their activities will not "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical...." 16 U.S.C. § 1536(a)(2).

Section 9 of the ESA, which applies to both federal and nonfederal actors, addresses prohibited actions with respect to endangered species only. At issue in this case is the scope of the "take" provision, § 1538(a)(1)(B), which makes it unlawful for any person to "take any [endangered] species within the United States." The ESA defines "take" as follows:

The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

16 U.S.C. § 1532(19). Although the ESA does not define the terms within this definition any further, the Secretary has promulgated a regulation defining the word "harm" as follows:

Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering.

50 C.F.R. § 17.3 (1991).

The prohibition against "takings" set out in § 1538(a)(1) applies only to those species listed as endangered. However, section 4(d) of the ESA allows the Secretary to extend some or all of the protections in § 1538(a)(1) to threatened species as well:

Whenever any species is listed as a threatened species ..., the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife....

16 U.S.C. § 1533(d). Pursuant to this section, the Secretary has adopted a regulation which extends the prohibitions listed in § 1538(a)(1), including the prohibition against "takings," to *all* wildlife species listed as threatened:

Except as provided in subpart A of this part, or in a permit issued under this subpart, all of the provisions in § 17.21 [which restates the prohibitions outlined in 16 U.S.C. § 1538(a)(1)] shall apply to threatened wildlife, except § 17.21(c)(5).

50 C.F.R. § 17.31(a) (1991).

Plaintiffs in this action are small landowners, small logging companies, and families allegedly dependent on the forest products industry in the Pacific Northwest and in the Southeast. In order to enforce the regulations at 50 C.F.R. § 17.3 and § 17.31(a) and to avoid "harm"-type takings of the northern spotted owl and other threatened wildlife species, the Fish and Wildlife Service ("FWS") has placed restrictions on timber harvesting. Plaintiffs claim that these restrictions have forced them to lay off employees, limited their income from trust lands, reduced the timber supply, and placed some of the plaintiffs in the position of being unable to support their families. They bring this action challenging the "harm" definition at 50 C.F.R. § 17.3 as contrary to the ESA and void for vagueness. Plaintiffs also challenge the Secretary's regulation at 50 C.F.R. § 17.31(a), extending the protections for endangered species to threatened species, as contrary to the ESA.

## DISCUSSION

■ In reviewing an agency's construction of a statute, a court must first determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Where the statute and the intent behind it are ambiguous with respect to a matter at issue, however, a court must decide whether the agency's construction of the statute is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. A court may not substitute its own construction of a statutory provision if the agency's interpretation is "reasonable." *Id.* at 844, 104 S.Ct. at 2782.

A. *The Definition of "Harm" at 50 C.F.R. § 17.3*

1. § 17.3 Does Not Violate the ESA

■ The Secretary's regulation at 50 C.F.R. § 17.3 defines "harm" to mean "an act which actually kills or injures wildlife"; the harm definition in § 17.3 includes "significant habitat modification or degradation

where it actually kills or injures wildlife." Plaintiffs argue that, by establishing habitat modification as a form of harm, this regulatory definition goes beyond the definition that Congress intended for the term "take." Under the ESA, the term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Congress made clear that the definition of "take" was to be interpreted "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S.Rep. No. 307, 93d Cong., 1st Sess. 7 (1973). *See also* H.R.Rep. No. 412, 93d Cong., 1st Sess. 11, 15 (1973) (" 'Take' is defined broadly"; prohibition against "takings" in Section 9 of ESA "includes, in the broadest possible terms, restrictions on the taking, importation and exportation, and transportation of [endangered] species.")

Notwithstanding this clear intent by Congress to give an expansive definition to the term "take," plaintiffs insist that Congress did not intend the term to reach habitat modification. In support of this contention, plaintiffs make three principal arguments. First, plaintiffs point out that the original ESA bill which was referred to the Senate Committee on Commerce, S. 1983, defined "take," with respect to fish or wildlife, to include "destruction, modification, or curtailment of its habitat or range." The fact that the bill was reported out of committee without any reference to habitat modification in the definition of "take" is an indication, plaintiffs argue, that the Senate intended the scope of the word "take" not to encompass habitat modification.

Plaintiffs are asking this Court to engage in speculation about legislative intent. The Court acknowledges that S. 1983 offered a different definition of the word "take" than the one that was subsequently adopted by the Senate Committee on Commerce. However, the Court notes that S. 1983 was only one of two endangered species bills under consideration by the Senate Committee on Commerce at that time. The other bill, S. 1592, defines "take" exactly as it now appears in the statute. From this legislative history, the Court can conclude no more than that the Senate chose to adopt the definition in one bill over that in another. There is absolutely nothing in the legislative history of the ESA to indicate that the Senate rejected the definition in S. 1983 specifically because it wanted to exclude habitat modification from the definition of take. In fact, the Senate Report indicates just the opposite, that "take" was being defined "in the broadest possible manner."

It may be, as defendants suggest, that the Senate rejected the definition of "take" in S. 1983 because it did not want habitat modification *per se* to constitute a taking; or it may be that the Senate chose to leave the decision of whether to define takings to include habitat modification in the hands of the Secretary. However, the Court will not rely upon such speculation to deduce legislative intent.

Plaintiffs' second argument is that Congress intended to address the problem of habitat modification exclusively through federal land acquisition, not through the take provision. Section 4 of the ESA grants the Secretary the authority to utilize land acquisition measures to carry out conservation programs for endangered and threatened species. *See* 16 U.S.C. § 1534. However, nothing in the language of § 1534 or in the legislative history of the land acquisition provision suggests that Congress intended land acquisition to be the *exclusive* protective mechanism for listed species' habitat. The language and legislative history of § 1534 clearly indicate that Congress considered land acquisition a critical tool in preserving habitat, but they do not suggest that Congress intended it to be the only tool. *See* 16 U.S.C. § 1534(a)(1) ("To carry out such a program [of species conservation], the appropriate Secretary shall utilize the land acquisition and other authority . . ."); H.R.Conf.Rep. No. 740, 93d Cong., 1st Sess. 25 (1973) ("Any effective program for the conservation of endangered species demands that there be adequate authority vested in the program managers to acquire habitat which is critical to

the survival of those species."); S.Rep. No. 307, 93 Cong., 1st Sess. 4 (1973) ("Often, protection of habitat is the only means of protecting endangered animals which occur on nonpublic lands.")

Finally, plaintiffs argue that the amendment which added the term "harm" to the ESA definition of "take" was a technical amendment which was never debated and should therefore not be interpreted expansively. *See* 119 Cong.Rec. 25,682–83 (1973) (clarifying amendments offered by Senator Tunney). Plaintiffs' argument itself relies upon an unwarranted expansive reading of the Secretary's regulation. Plaintiffs claim that the § 17.3 definition of "harm," unlike every other component of the "take" definition, "allows land use or habitat modification actions to be barred as takings." Plaintiffs' Mem. for Summary Judgment at 21. The Secretary correctly points out, however, that not all habitat modification actions constitute "harm" under the § 17.3 definition; rather, only an action which "actually kills or injures wildlife" falls into the category of "harm." The Secretary's definition thus requires proof of actual killing or injury to wildlife, consistent with the ESA's definition of "take."

The Court concludes that the Secretary's definition of harm at § 17.3 is entirely consistent with the ESA's definition of take. Congress made clear that it was defining "take" extremely broadly, "to include every conceivable way in which a person can 'take' or attempt to 'take.'" S.Rep. No. 307, at 7. Courts interpreting the "take" definition have consistently upheld the Secretary's definition of "harm" under the ESA. *See TVA v. Hill,* 437 U.S. 153, 184–85 n. 30, 98 S.Ct. 2279, 2297 n. 30, 57 L.Ed.2d 117 (1978); *Palila v. Hawaii Dep't of Land & Natural Resources (Palila I),* 471 F.Supp. 985 (D.Haw.1979), *aff'd,* 639 F.2d 495 (9th Cir.1981)[1]; *Palila v. Hawaii Dep't of Land & Natural Resources (Palila II),* 852 F.2d 1106 (9th Cir.1982).

It is worth noting that, in 1982, when Congress reauthorized the ESA and amended certain of its provisions, Congress was aware of these court decisions. *See* Endangered Species Act of 1973: Hearings Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the House Comm. on Merchant Marine and Fisheries (hereinafter "Hearings"), 97th Cong., 2d Sess. 291, 329, 331, 343 (1982). Moreover, the precise question at issue in this case arose in the House hearings on the proposed reauthorization bill. One panelist before the subcommittee, Ken Berlin of the National Audubon Society, pointed out that industry groups had been seeking to remove the word "harm" from the ESA's definition of "take" because they disagreed with the Secretary's interpretation of that word to include habitat modification. Hearings, at 290. In response to subsequent questioning by Congressman Edwin B. Forsythe, Robert Carlton of the National Forest Products Association and Mr. Berlin specifically addressed the issue of whether the statutory definition of "take" was intended to include habitat modification. Hearings, at pp. 342–43. Rather than argue about statutory interpretation, Congressman William J. Tauzin turned the panelists' attention to the exemption process in Section 10(a) of the ESA, and the discussion subsequently focused on amending that section to promote its efficiency. *Id.* at 344–46. The reauthorization bill that was eventually adopted by Congress did not amend the original definition of "take" to exclude the word "harm" or to correct the Secretary's definition of that term. Instead, it amended the provisions of the Section 10(a) permit process "to encourage creative partnerships between the public and private sectors and among governmental agencies in the interest of species and habitat conservation."

---

1. Both the *TVA v. Hill* and *Palila I* decisions were issued when a prior version of the Secretary's regulation was in effect; that prior version also defined "harm" to include habitat modification. The Secretary revised the language of the harm definition in 1981, but without changing its basic meaning. The final regulation simply clarified that habitat modification would not be considered a taking unless there was proof of attendant death or injury. *See* 46 Fed.Reg. 54,748 (November 4, 1981).

H.Rep. No. 835, 97th Cong., 2d Sess. 30 (1982).

Finally, the structure of the ESA supports the Court's conclusion that Congress intended "take" to be interpreted broadly, even to include habitat modification. Plaintiffs suggest that the § 17.3 definition of "harm" to include habitat modification makes the land acquisition provision of the ESA largely superfluous. However, as defendants point out, there is considerable overlap in the ESA between different provisions of different sections of the ESA, and this overlap is completely consistent with the statute's purpose of attacking the issue of conservation as aggressively as possible. The land acquisition provision of Section 5 offers a solution to the problem of habitat modification through federal spending; the take prohibitions of Sections 7 and 9 offer solutions through civil and criminal sanctions.

■ The Court thus concludes that the language, structure and history of the ESA reveal that Congress intended an expansive interpretation of the word "take," an interpretation that encompasses habitat modification. However, even if the Court were somehow to find the ESA "silent or ambiguous" with respect to this issue, it would nevertheless uphold the Secretary's regulation as a reasonable interpretation of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781.

Plaintiffs have not addressed the question of the reasonableness of the Secretary's regulation under the second part of the *Chevron* test. In light of the statute's broad definition of "take," and the absence of any explicit language in the legislative history precluding habitat modification from the scope of that definition, the Court cannot conclude that § 17.3 is an impermissible construction of the statute. Were the Court to reach the second step in *Chevron,* therefore, it must defer to the Secretary's interpretation.

2. § 17.3 Is Not Void for Vagueness

■ Plaintiffs also claim that the Secretary's definition of "harm" violates the Fifth Amendment's due process guarantee against vague regulations. This constitutional challenge is purely facial; plaintiffs do not allege that they are being threatened with actual criminal enforcement of the regulation.

■ In general, the void for vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). The primary purpose of the doctrine is to provide citizens with actual notice of offensive conduct, to prevent arbitrary enforcement of criminal laws, and to ensure that such laws establish minimal guidelines to govern law enforcement. *Id.* at 358, 103 S.Ct. at 1858.

Defendants argue that, in order to succeed in their vagueness challenge, plaintiffs must demonstrate that the regulation is impermissibly vague in all of its applications. They point out that this is a facial challenge which does not implicate any "constitutionally protected conduct" such as expressive rights under the First Amendment. *Village of Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). Plaintiffs insist that § 17.3 implicates private property rights protected by the Fifth Amendment, and that therefore the broad standard of proof for vagueness outlined in *Flipside* should not apply to their "constitutionally protected conduct."

■ The Court agrees with plaintiffs that § 17.3 implicates private property rights protected under the Fifth Amendment. It cannot, however, conclude that such Fifth Amendment interests constitute "constitutionally protected conduct" within the meaning of *Flipside.* Rather, the Court must apply the familiar standard outlined in *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d

706 (1975): "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."

The facts of this case establish that the challenged regulation is not void for vagueness. The definition of "harm" found at § 17.3 clearly limits prohibited conduct to that which "actually kills or injures wildlife." 50 C.F.R. § 17.3. Furthermore, the regulation prohibits only *significant* habitat modification or degradation," expressly defined as modification or degradation which "actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.* (emphasis added) As defendants point out, the determination of whether there has been a violation of this regulation requires an evaluation of the species involved, the biological needs of that species, and the degree of habitat modification, all of which are readily ascertainable. Moreover, the regulation itself requires a finding that actual death or injury to a species has occurred. The terms of the regulation thus clearly provide more than "minimal guidelines" and are sufficiently clear to put a party on notice of prohibited conduct.

Finally, in order to establish a violation of the ESA under this regulation or any other, the government must prove that the charged party *knowingly* committed the violation. *See* 16 U.S.C. § 1540(a) & (b). This intent requirement goes a long way towards vitiating vagueness concerns, since it eliminates the possibility that a person will be prosecuted for conduct which he or she did not know was unlawful. Nor have plaintiffs offered any evidence, other than hypothetical possibilities, that the FWS is enforcing this regulation in an arbitrary and discriminatory manner. The Court therefore concludes that § 17.3 is not impermissibly vague.

B. *The Extension of the Taking Prohibitions at 50 C.F.R. § 17.31(a)*

■ The Secretary's regulation at 50 C.F.R. § 17.31(a) extends to threatened species all the protections that the ESA affords to endangered species. This regulation was promulgated under the authority set out in Section 4(d) of the ESA, which states in pertinent part:

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife,....

16 U.S.C. § 1533(d). Plaintiffs argue that § 4(d) imposes limitations on the Secretary's ability to extend the taking prohibitions for endangered species to threatened species. First, they claim that § 4(d) allows such extensions only on a species-by-species basis. Second, they argue that § 4(d) requires any such regulation to be accompanied by an explicit finding that the extension is "necessary and advisable" for the conservation of the threatened species.

■ The Court cannot accept plaintiffs' arguments. The plain language of the ESA clearly grants the Secretary the authority to promulgate a regulation such as § 17.31(a). Where a statute is clear and unequivocal on its face, a court's decision may rest on the words of the statute itself, at least where it is not manifestly inconsistent with legislative intent. *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1040 (D.C.Cir.1991); *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 106 (D.C.Cir.1976). In this case, the language of the statute allows the Secretary to "prohibit with respect to *any* threatened species *any* act prohibited under section 1538(a)(1) of this title." 16 U.S.C. § 1533(d) (emphasis added). The word "any" encompasses the entire range of threatened species and prohibited acts which the Secretary might consider. It allows the Secretary to prohibit one act with respect to one threatened species or as many as *all* acts with respect to *all* threatened species.

Nothing in the language or legislative history of the statute requires the Secre-

tary to promulgate regulations under § 4(d) on a species-by-species basis. On the contrary, the statute gives the Secretary broad discretion to issue regulations "as he deems necessary and advisable." Plaintiffs' reading of this phrase as a requirement that the Secretary must issue some kind of "necessary and advisable" findings in conjunction with any promulgated regulation completely distorts the statutory language. The Secretary is not required to issue *findings* under § 4(d); he is required to issue regulations. To interpret the phrase as plaintiffs suggest would be to rewrite the statute.

The legislative history of the ESA offers no evidence that the Court's plain reading of the language of § 4(d) is "manifestly inconsistent with legislative intent." *Gatewood,* 933 F.2d at 1040. While the legislative record does contain statements which suggest that the Secretary would, under § 4(d), draft regulations on an individual basis for each threatened species, there is nothing in the record to suggest that he is *required* to do so. In fact, the Senate Report evidences Congress' awareness of, and acquiescence in, a more sweeping use of § 4(d). *See* S.Rep. No. 307, 93d Cong., 1st Sess. 8 (1973) (allowing the Secretary to make "any or all" of the acts prohibited for endangered species also prohibited as to threatened species).

The Court thus concludes that § 17.31(a) is not contrary to the ESA.

## CONCLUSION

The Court concludes that both of the regulations challenged in this action, 50 C.F.R. § 17.3 and 50 C.F.R. § 17.31(a), are consistent with the ESA. Furthermore, § 17.3 is not void for vagueness. The Court thus will grant defendants' motion for summary judgment and deny plaintiffs' motion for summary judgment. An Order consistent with this Memorandum Opinion will be entered on this date.