SWEET HOME CHAPTER OF COM-
MUNITIES FOR A GREAT ORE-
GON, et al., Appellants,

v.

Bruce BABBITT, Secretary of the
Interior, et al., Appellees.

No. 92–5255.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 17, 1993.

Decided July 23, 1993.

John A. MacLeod, with whom Steven P. Quarles and Thomas R. Lundquist, Washington, DC, were on the brief, for appellants.

Ellen J. Durkee, Attorney, Dept. of Justice, with whom Martin W. Matzen and Jean

E. Williams, Attorneys, Dept. of Justice, Washington, DC, were on the brief, for appellees.

Before MIKVA, Chief Judge; WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA, except section II(A)(1), which is filed *per curiam.* Opinion concurring in section II(A)(1) filed by Chief Judge MIKVA. Opinion concurring in section II(A)(1) filed by Circuit Judge WILLIAMS.

Opinion dissenting in part filed by Circuit Judge SENTELLE.

MIKVA, Chief Judge:

Appellants, a group of non-profit citizens' groups, lumber companies, and lumber trade associations, oppose two regulations promulgated by the Fish and Wildlife Service ("FWS" or "agency") under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44. They appeal a memorandum opinion and order by the district court upholding the regulations by summary judgment and denying appellants' own motion for summary judgment. We find that the challenged regulations are reasonable interpretations of the ESA. We also reject appellants' claim that one of the regulations is void for vagueness. We therefore affirm the district court's judgment.

## I. BACKGROUND

The Endangered Species Act of 1973 is a multifaceted and comprehensive law directed toward halting the extinction of species. It is implemented primarily by the Fish and Wildlife Service, an agency of the Department of the Interior. The ESA employs a number of techniques to preserve endangered and threatened species, including land acquisition by the government, the implementation of conservation programs by federal agencies, and the prohibition of various federal and private actions that harm listed species.

Among the more important sections of the ESA is 16 U.S.C. § 1538(a)(1), which forbids any person from committing any of a broad array of activities deemed dangerous to the continued survival of endangered fish and wildlife species. This appeal focuses largely on the prohibition against "taking" an endangered species.

> [W]ith respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to ... *take* any such species within the United States or the territorial sea of the United States[.]

16 U.S.C. § 1538(a)(1)(B) (emphasis added).

The ESA defines "take" as follows: "[T]o harass, *harm*, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (emphasis added). Much of the controversy surrounding this definition has concerned the meaning of "harm" and the degree to which this term encompasses damage to habitats. One of the FWS regulations challenged by appellants states:

> *Harm* in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering.

50 C.F.R. § 17.3 (as amended in 1981). Appellants contend that this regulation's inclusion of habitat modification within the meaning of "take" violates the ESA. They also assert that even if the regulation is not *ultra vires* of the ESA, it is not clear precisely what sort of habitat modification the regulation forbids. They therefore argue that this Court should either declare the regulation void for vagueness or adopt a limiting construction of the regulation, holding that "harm" occurs only where there is an intentionally-caused actual physical injury to a specific member of a listed wildlife species.

The other regulation under review extends the protections for endangered species to threatened species as well. The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range...." 16 U.S.C. § 1532(6). The ESA also protects

species that are in less immediate peril but are listed as "threatened species." This term refers to "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

On its face, 16 U.S.C. § 1538(a)(1) applies its prohibitions, including the prohibition against takings, only to endangered species. However, the ESA allows the FWS to apply these prohibitions to threatened species, as well.

> Whenever any species is listed as a threatened species ... the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife....

16 U.S.C. § 1533(d).

Appellants challenge a FWS regulation which, at one fell swoop, brings all threatened fish and wildlife species into the protective net of 16 U.S.C. § 1538(a)(1).

> Except as provided in subpart A of this part, or in a permit issued under this part, all of the provisions in [50 C.F.R. § 17.21, the regulation implementing the section 1538(a)(1) prohibitions] shall apply to threatened wildlife....

50 C.F.R. § 17.31(a) (1978). Appellants argue that this regulation violates the ESA, because § 1533(d) requires the FWS to extend the prohibitions to threatened species on a species-by-species basis and to do so only after making a specific finding that each such extension was "necessary and advisable."

The district court rejected appellants' challenges to both 50 C.F.R. § 17.3 and § 17.-31(a) and granted summary judgment to the government. 806 F.Supp. 279. Because all of the issues in this appeal are issues of law, we will review the district court's judgment *de novo*.

## II.  ANALYSIS

### A.  The "harm" regulation

#### 1.  Compliance with the Endangered Species Act

Appellants argue that the "harm" regulation, 50 C.F.R. § 17.3, violates the ESA, because the statute excludes habitat modification from the types of forbidden actions that qualify as "takings" of species. They assert that the ESA's language and structure, as well as its legislative history, clearly demonstrate that Congress did not intend to prohibit habitat modification when it defined "take" to include "harm" to an endangered species. 16 U.S.C. § 1532(19). They claim that the meaning of harm should therefore be limited to direct physical injury to an identifiable member of a listed wildlife species.

We hold, *per curiam*, that the "harm" regulation does not violate the ESA by including actions that modify habitat among prohibited "takings."

#### 2.  The "void for vagueness" claim

Appellants also maintain that, on its face, the "harm" regulation is void for vagueness. They point out that the Ninth Circuit has interpreted the regulation broadly so that prohibited "harm" includes habitat modification even without proof that death or physical injury to a specific member of a listed species has occurred. *Palila v. Hawaii Dept. of Land and Natural Resources*, 852 F.2d 1106, 1107–09 (1988). The appellants could also have mentioned that the FWS itself offered a similarly broad interpretation of the regulation when it introduced the current definition of "harm" in 1981:

> Some of the comments in favor of the redefinition ... viewed the action as limiting "harm" to direct physical injury to an individual member of the wildlife species. This was not the intent of the Service and the final redefinition addresses that perception. The purpose of the redefinition was to preclude claims of a Section 9 taking for habitat modification alone without any attendant death or injury of the protected wildlife. Death or injury, however,

may be caused by impairment of essential behavioral patterns which can have significant and permanent effects on a listed species.

46 Fed.Reg. 54,748, 54,748 (1981).

Appellants argue that so long as the regulation is subject to such broad constructions, it is impermissibly vague. They claim it will be left to the whims and predictions of biologists to determine when a habitat modification is *"significant"* and when such a modification *"significantly* impair[s] *essential* behavioral patterns." 50 C.F.R. § 17.3 (emphasis added). Property owners, say appellants, will thus be subject to criminal sanctions under the ESA based on "some biologist's subjective view."

We are urged to address this problem by construing the regulation to state that "harm" occurs only where there is proof of an intentionally-caused physical injury to a specific member of a listed wildlife species. If we determine that the regulation does not require such proof, appellants contend that we should declare the entire regulation void for vagueness.

It is true, as appellants assert, that regulations with criminal sanctions must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). This principle, however, does not lead to the conclusion that any person can have a regulation wiped off the books (or prompt a limiting judicial construction of the regulation) merely by showing that it will be impermissibly vague in the context of some hypothetical application.

The seminal case concerning pre-enforcement facial challenges on the grounds of vagueness is *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). *Flipside* states that when a court examines such a challenge, "assuming the enactment implicates no constitutionally protected conduct, [the court] should uphold the challenge only if the enactment is impermissibly vague in *all of its applications."* *Id.* at 495, 102

S.Ct. at 1191 (emphasis added). Although the Supreme Court does not state precisely what it means by "constitutionally protected conduct," it is clear that it is referring primarily to the First Amendment expressive freedoms, which have long received special protection in vagueness cases. *See, e.g. Smith, Sheriff v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974). It is equally clear that the Court is not referring to economic activity, which modern vagueness cases have invariably afforded less protection. *See, e.g., Flipside,* 455 U.S. at 498, 102 S.Ct. at 1193 ("economic regulation is subject to a less strict vagueness test").

Appellants, who are not currently the subject of an enforcement action under 50 C.F.R. § 17.3, nonetheless contend that the regulation will inhibit their ability to develop their land, especially by harvesting timber. In other words, the conduct implicated by this case is economic activity. (To the degree that appellants contend that the regulation results in a "taking" of their property in the Fifth Amendment sense, their remedy would be compensation, not a voiding of the regulation.) In accordance with *Flipside,* we therefore will not find 50 C.F.R. § 17.3 void for vagueness unless the regulation is impermissibly vague in all of its applications.

In fact, the regulation contains features that prevent it from being invariably vague as applied. The definition of "harm" explicitly limits prohibited habitat modification to that which "actually kills or injures wildlife." 50 C.F.R. § 17.3. Moreover, in order to establish a civil or criminal violation under the "take" provision of the ESA or a regulation implementing that provision, the government must establish that the charged party *knowingly* violated the statute or regulation. 16 U.S.C. § 1540(a) and (b). The Supreme Court has recognized that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Flipside,* 455 U.S. at 499, 102 S.Ct. at 1193.

In light of these limitations, there are obviously types of activity, including habitat modification, that 50 C.F.R. § 17.3 clearly prohib-

its without a hint of vagueness. For example, it obviously forbids the very sort of conduct that appellants argue it should be limited to—habitat modification that causes ascertainable physical injury or death to an individual member of a listed species. Furthermore, § 17.3 unquestionably prohibits major acts of habitat degradation that destroy a species' ability to breed, feed, or shelter. For instance, a person aware of the regulation would undoubtedly be held accountable for clear-cutting an entire forested area known to be populated by spotted owls.

Because the regulation is not vague in all of its applications, we may not declare it void on its face. We do not dismiss the possibility that some enforcement contexts may arise in which the challenged regulation would be considered impermissibly vague. Under *Flipside,* however, the fact that there might be some type of activity whose legality is blurry under the regulation does not render the entire regulation facially invalid. Specific vagueness concerns about the regulation can be addressed when and if they are properly raised in the framework of a concrete challenge to a particular application of the regulation.

Appropriate judicial restraint obligates us to wait for specific applications of the regulation to arise, for, as *Flipside* observed, the government may in the meantime take further steps "that will sufficiently narrow potentially vague or arbitrary interpretations" of the regulation. 455 U.S. at 504, 102 S.Ct. at 1196. "Although it is possible that specific future applications ... may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise." *Joseph E. Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 52, 86 S.Ct. 1254, 1265, 16 L.Ed.2d 336 (1966), *overruled on different grounds by Healy v. Beer Institute, Inc.,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989).

*B.   The blanket extension of protections to all threatened species*

■ Appellants also challenge 50 C.F.R. § 17.31(a), by which the FWS extended the 16 U.S.C. § 1538(a)(1) prohibitions as to endangered species to all threatened species as well. The FWS issued this regulation under the authority granted to it by the ESA at 16 U.S.C. § 1533(d). For the sake of convenience, we quote that provision again:

> Whenever any species is listed as a threatened species ... the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife....

16 U.S.C. § 1533(d).

The challenged regulation provides in relevant part:

> (a) Except as provided in subpart A of this part, or in a permit issued under this subpart, all of the provisions in § 17.21 [which implements the prohibitions contained in 16 U.S.C. § 1538(a)(1) ] shall apply to threatened wildlife, except § 17.-21(c)(5).

> \*   \*   \*   \*   \*   \*

> (c) Whenever a special rule in §§ 17.40 to 17.48 applies to a threatened species, none of the provisions of [paragraph (a) ] of this section will apply. The special rule will contain all the applicable prohibitions and exceptions.

50 C.F.R. § 17.31.

In short, the FWS has, with this regulation, established a regime in which the prohibitions established for endangered species are extended automatically to all threatened species by a blanket rule and then withdrawn as appropriate, by special rule for particular species and by permit in particular situations. Although appellants' dissatisfaction is focused entirely on this treatment of the "take" prohibition, the regulation applies all of the § 1538(a)(1) prohibitions to threatened species in this manner.

Appellants contend that the FWS has created the system upside down, in violation of the ESA. They maintain that § 1533(d) requires the Secretary to extend the prohibitions to threatened species on a species-by-species basis. They also assert that the statute requires the agency to explain in each

instance why it is "necessary and advisable" to apply the prohibitions to a threatened species.

We are not persuaded. As was the case with the "harm" regulation, there is no clear indication that § 17.31(a) violates the intent of the ESA. The statute does not unambiguously compel the agency to expand regulatory protection for threatened species only by promulgating regulations that are specific to individual species. In light of the substantial deference we thus owe the agency under the principles of *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we uphold the challenged regulation as a reasonable interpretation of the statute.

Appellants argue that the plain language of the ESA establishes that Congress intended regulations extending the § 1538(a)(1) prohibitions to threatened species to apply only to individual species. They focus on the first sentence of § 1533(d), pointing out its clear use of the singular. ("Whenever *any species* is listed as *a threatened species....*") They maintain that in light of the first sentence's unambiguous reference to regulations for a single threatened species, the phrase "any threatened species" in the second sentence must also refer to the singular. Appellants finally note that the Senate Report bolsters their interpretation of the language of § 1533(d) as authorizing regulations tailored to individual species.

> [The section] requires the Secretary, once he has listed *a species* of fish or wildlife as *a threatened species,* to issue regulations to protect *that species.* Among other protective measures available, he may make any or all of the acts and conduct defined as "prohibited acts" ... as to "endangered species" also prohibited acts as to *the particular threatened species.*

S.REP. No. 93–307, 93d Cong., 1st Sess. 8 (1973), U.S.Code Cong. & Admin.News 1973, pp. 2989, 2996. (emphasis added).

It is, however, less than clear that the language of § 1533(d) is actually intended to require regulations extending the § 1538(a)(1) prohibitions to apply only to individual species. The reference to "any threatened species" in the second sentence of § 1538(d) could just as easily mean "any or all threatened species" as "any one threatened species." And appellants' claim that the clear meaning of the first sentence should control our interpretation of the second is not necessarily valid, for, as appellees argue, the two sentences may represent separate grants of authority. It is possible that it is the second sentence alone that grants the agency authority to extend the § 1538(a)(1) prohibitions to threatened species. *See infra* pp. 7–8.

Furthermore, in response to appellants' use of the Senate Report, appellees counterpose the use of plural language in the discussion of § 1533(d) in the House Report.

> The Secretary is authorized to issue appropriate regulations to protect endangered or threatened species; he may also make specifically applicable any of the prohibitions with regard to *threatened species* that have been listed in section 9(a) as are prohibited with regard to endangered species. Once an animal is on the threatened list, the Secretary has almost an infinite number of options available to him with regard to the permitted activities for *those species.* He may, for example, permit taking, but not importation of *such species,* or he may choose to forbid both taking and importation but allow the transportation of *such species.*

H.R.REP. No. 93–412, 93d Cong., 1st Sess. 12 (1973). The possible conflict between the two reports, as well as the apparent inconsistency within the above-quoted paragraph itself as to singular and plural, shows the perils of attempting to use ambiguous legislative history to clarify ambiguous words within statutes.

In any case, even assuming that the reference to "any threatened species" in the second sentence of § 1533(d) is singular, the statute still would not clearly forbid the FWS from proceeding in the manner it did. Appellants impart inappropriate significance to the use of the singular versus the plural. The very first provision of the United States Code states, "In determining the meaning of any Act of Congress, unless the context indicates otherwise ... words importing the sin-

gular include and apply to several persons, parties, or things [and] words importing the plural include the singular." 1 U.S.C. § 1.

Furthermore, regardless of the use of singular and plural words, § 1533(d) simply does not speak directly to the question of whether the FWS must promulgate protections species-by-species or may extend such protection in a single rulemaking. We will rarely impose a particular procedural strategy on an agency when the relevant statute does not even explicitly address how the agency should proceed. "In [the] process of filling any gap left, implicitly or explicitly, by Congress, the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 448, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) (citations omitted).

Appellants attempt to bolster their argument by claiming that the design and structure of the ESA unavoidably require the FWS to extend the § 1533(d) prohibitions to threatened species on a species-by-species basis. They contend that Congress created the distinct categories of endangered and threatened species specifically so that each category would receive the precise degree of protection it required. By presumptively according the very same protections to threatened species as to endangered species, they argue, the FWS is violating this statutory design.

This argument also fails, because regardless of the ESA's overall design, § 1533(d) arguably grants the FWS the discretion to extend maximum protection to all threatened species at once if, guided by its expertise in the field of wildlife protection, it finds it expeditious to do so. In any case, even assuming that Congress intended there to be an indelible difference between the treatment of endangered species and threatened species, appellants fail to acknowledge the very real differences that exist even under the challenged regulation. As noted above, *supra*, p. 5, the regulation contemplates the issuance of "special rules" for individual threatened species. 50 C.F.R. § 17.31(c). The FWS has actually issued special rules

for a substantial number of the fish and wildlife species listed as threatened. *See* 50 C.F.R. §§ 17.40–48.

Moreover, FWS regulations provide for the issuance of permits, under certain circumstances, to individual applicants who request permission to commit otherwise prohibited activities with respect to threatened wildlife. 50 C.F.R. § 17.32. Similar permits are available with regard to endangered species, 50 C.F.R. §§ 17.22–.23, but the FWS has made clear that they are more readily available for threatened species.

> The new Subpart D would establish a set of blanket prohibitions for threatened wildlife. These are the same prohibitions that the Act provides for endangered wildlife.... The new Subpart D would then provide for permits for any threatened wildlife. These permits would be more liberal than permits available under Subpart C ... for endangered wildlife, in that they would be available for more purposes, and the strict procedural rules for endangered wildlife permits would not apply.

40 Fed.Reg. 28,713 (1975).

The FWS has thus maintained a two-tier approach to species protection. Consequently, even if the ESA does in fact mandate that the agency preserve different approaches to the conservation of endangered and threatened species, the regulatory scheme satisfies the statute.

Lastly, appellants claim that 50 C.F.R. § 17.31(a) violates the ESA because § 1533(d) requires the FWS to make individualized formal findings that the prohibitions are "necessary and advisable" for the conservation each threatened species to which they are extended. Not only did the agency fail to make such findings for each individual species; it did not even make such a finding in regard to the category of threatened species as a whole when it issued the blanket extension of prohibitions.

As appellees argue, however, there is a reasonable reading of § 1533(d) that would not require the FWS to issue formal "necessary and advisable" findings when extending the prohibitions to threatened species. According to this interpretation, the two sen-

tences of § 1533(d) represent separate grants of authority. The second sentence gives the FWS discretion to apply any or all of the § 1538(a)(1) prohibitions to threatened species without obligating it to support such actions with findings of necessity. Only the first sentence of § 1533(d) contains the "necessary and advisable" language and mandates formal individualized findings. This sentence requires the FWS to issue whatever other regulations are "necessary and advisable," including regulations that impose protective measures *beyond* those contained in § 1538(a)(1).

In sum, we find it far from clear that 16 U.S.C. § 1533(d) requires the FWS to extend protections to threatened species on a species-by-species basis or that it mandates that the agency issue formal findings of necessity to support each such extension. In light of the statute's ambiguity, the challenged FWS regulation is a reasonable and permissible construction of the ESA. We therefore uphold 50 C.F.R. § 17.31(a).

### III.  CONCLUSION

Neither the regulation defining harm nor the regulation extending blanket protection to threatened species is an unreasonable interpretation of the Endangered Species Act. Moreover, the "harm" regulation is not impermissibly vague on its face. We therefore affirm the judgment of the district court and uphold both regulations.

*It is so ordered.*

MIKVA, Chief Judge, concurring in Section II(A)(1) of the opinion:

I write separately in order to articulate fully my reasons for rejecting appellants' argument that we should set aside the "harm" regulation as violative of the ESA.

When we review an agency's construction of a statute that it is entrusted to administer, we follow the deferential approach set out by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "If the statute is clear and unambiguous that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguous-

ly expressed intent of Congress." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) (citations omitted). If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. "In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844, 108 S.Ct. at 2782.

Appellants contend that Congress clearly intended to exclude habitat modification from the types of takings prohibited by the ESA and that this Court thus owes no deference to the FWS "harm" regulation. I disagree. In my view, the "harm" regulation conflicts with neither the ESA itself nor its ambiguous legislative history and is unquestionably a permissible and reasonable construction of the statute. I therefore do not accept appellants' claim that 50 C.F.R. § 17.3 transgresses the ESA.

It is hard to construct a legislative scenario in which Congress would have avoided the problem of habitat modification when it crafted the ESA. The drafters of the statute realized that the degradation of habitats posed one of the gravest threats to the continued existence of endangered and threatened species. As the Supreme Court has noted:

> In shaping [the ESA], Congress started from the finding that "[t]he two major causes of extinction are hunting and destruction of natural habitat." S.Rep. No. 93–307, p. 2 (1973). Of these twin threats, Congress was informed that the greatest was destruction of natural habitats....

*TVA v. Hill*, 437 U.S. 153, 179, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978). Indeed, the first stated purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved...." 16 U.S.C. § 1531(b).

Appellants acknowledge that Congress intended to halt injurious habitat modification

when it passed the ESA. They contend only that Congress did not mean to combat habitat degradation on private lands through the prohibition against takings in 16 U.S.C. § 1538. They argue that Congress intended to combat this problem solely through § 1534's provision for federal land acquisition.

According to appellants, the legislative history of the "take" provision establishes that Congress did not mean for that term to encompass habitat modification. They note that the original bill that was referred to the Senate Committee on Commerce, S. 1983, defined "take" to include "destruction, modification, or curtailment of [an endangered species'] habitat or range." S. 1983, 93d Cong., 1st Sess., § 3(6) (1973). The bill reported out of committee, however, did not refer to habitat modification in the definition of "take." This omission, appellants argue, evinces Congress' intent not to include habitat modification within the scope of prohibited "takings."

Appellants maintain that Congress intended instead to address the problem of habitat modification caused by private actions on private lands exclusively through land acquisition by the federal government. Section 1534 authorizes the Secretary of the Interior, as well as the Secretary of Agriculture with respect to the National Forest System, to acquire land as part of "a program to conserve fish, wildlife, and plants, including those which are listed as endangered species or threatened species...." 16 U.S.C. § 1534(a). Appellants point to various statements in the legislative history that suggest that some members of Congress may have wanted land acquisition, not the prohibition of land uses, to be the ESA's sole weapon against habitat modification on private lands. Appellants further argue that Congress logically *must* have intended land acquisition to be the exclusive mechanism for preventing such habitat modification. Otherwise, they contend, agency officials would always choose the free alternative of prohibiting a damaging land use under the "take" provision, rather than paying to acquire the affected land.

I find the legislative history to be most ambiguous regarding whether Congress intended to include habitat modification within the meaning of "take." It is true that the Senate Committee chose not to use the S. 1983 definition of "take," which specifically encompassed habitat modification. Instead, the Committee adopted a definition from the other bill under consideration, S. 1592, which did not explicitly include habitat modification. But as the district court noted, there is no indication in the legislative history as to why the Committee selected one definition over the other.

There is nothing to suggest that Congress chose the definition it did in order to exclude habitat modification. The Committee may have rejected the S.1983 definition only because it apparently would have made habitat modification a *per se* violation of the ESA. It is certainly possible that the Committee did not intend to foreclose an administrative regulation prohibiting habitat modification— so long as that prohibition was accompanied by limitations, such as those contained in the FWS regulation under review, requiring that there be actual injury or death to the species. In any case, Congress manifested no clear intent to exclude habitat modification from the "take" definition. Indeed, the Senate Committee Report states that " 'Take' is defined ... in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S.REP. No. 93–307, 93d Cong., 1st Sess. 7 (1973), U.S.Code Cong. & Admin.News 1973, 2995.

Appellants' contention that Congress intended land acquisition to be the exclusive instrument for curbing habitat modification on private lands is similarly speculative. Nothing in the language of 16 U.S.C. § 1534 or in the legislative history establishes that Congress meant land acquisition to be the only mechanism for habitat protection on private lands. The only evidence appellants can garner in support of their assertion to the contrary is a few isolated and ambiguous remarks by members of Congress on the floor. *See* 119 CONG.REC. 25,669 (1973) (statement of Sen. Tunney); 119 CONG.REC. 30,162 (1973) (statement of Rep. Sullivan); 119 CONG.REC. 25,691 (1973) (statement of Sen. Nelson). The general rule is that "de-

bates in Congress expressive of the views and motives of individual members are not a safe guide ... in ascertaining the meaning and purpose of the law-making body." *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 474, 41 S.Ct. 172, 179, 65 L.Ed. 349 (1921). In any case, these statements do not establish that even the speakers themselves intended land acquisition to be the *exclusive* protective mechanism for habitats on private lands.

There is also little force behind appellants' claim that including habitat modification within the meaning of "take" renders the land acquisition provision of § 1534 a nullity. Appellants suggest that agency officials will not pay to acquire land if they can accomplish the same habitat preservation objective without cost by banning the offending land use. But there are in fact many reasons why, in its effort to protect endangered and threatened species, the government might choose to acquire land rather than simply forbid damaging activity. Federal wildlife managers can surely do more to help such species on government-owned and controlled preserves than they could ever accomplish on private lands. Indeed, § 1534 land acquisition is explicitly designed to facilitate "conservation programs," a phrase that suggests a type of intervention more complex and proactive than simply forbidding certain activities on private lands.

Appellants argue that the agency must interpret the word "harm" narrowly so as not to include habitat modification because none of the other "take" terms—"harass, ... pursue, hunt, shoot, wound, kill, trap, capture, [and] collect"—represents a land use action that injures wildlife only indirectly. They argue that under the principle of statutory construction known as *noscitur a sociis,* a general term in a list should be interpreted narrowly "to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961).

Despite appellants' suggestions, however, the other prohibitions can limit a private landowner's use of his land in a rather broad manner. In particular, the prohibition against "harassment" can be used to suppress activities that are in no way intended to injure an endangered species. The House Report stated:

[Take] includes harassment, whether intentional or not. This would allow, for example, the Secretary to regulate or prohibit the activities of birdwatchers where the effect of those activities might disturb the birds and make it difficult for them to hatch or raise their young.

H.R.Rep. No. 93–412, 93d Cong., 1st Sess. 11 (1973). Indeed, the FWS has defined "harass" in a way that is almost as broad as the "harm" definition:

*Harass* in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering.

50 C.F.R. § 17.3. Appellants have not challenged this definition.

*Noscitur a sociis* means, literally, that a word is known by the company it keeps. *Jarecki,* 367 U.S. at 307, 81 S.Ct. at 1582. In the definition of "take," the term "harm" is accompanied by an assortment of words ranging from the precise and narrow "shoot" to the vague and expansive "harass." Consequently, even if I were willing to find an agency's construction of a statute to be impermissible based solely on a seldom-used and indeterminate principle of statutory construction, I would not do so in the present case.

Although the ESA is generally ambiguous as to whether the "take" prohibition forbids habitat modification, there is at least one feature of the statute that strongly suggests that Congress did in fact intend to include habitat modification within the meaning of "take." In 1982, Congress amended the ESA to include a provision authorizing the FWS to issue a permit allowing "any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

By allowing the agency, at its discretion, to permit "incidental takings," Congress implicitly confirmed that incidental takings were otherwise forbidden by the Act. And it is hard to imagine what "incidental takings" might be other than habitat modification. Indeed, the legislative history of the 1982 amendments reveals that habitat modification was precisely what Congress had in mind. The House Report states, "This provision is modeled after a habitat conservation plan that has been developed by three Northern California cities.... [It] will ... provide the institutional framework to permit cooperation between the public and private sectors in the interest of endangered species and habitat conservation." H.R.Rep. No. 97–835, 97th Cong., 2d Sess. 30–31 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2807, 2871, 2872.

Overall, there is nothing in the ESA itself or in its legislative history that unambiguously demonstrates that the term "take" does not encompass habitat modification. Indeed, as I noted in my discussion of the 1982 amendments, there is evidence to the contrary. *Chevron* commands that unless it is absolutely clear that an agency's interpretation of a statute, entrusted to it to administer, is contrary to the will of Congress, courts must defer to that interpretation so long as it is reasonable. *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782.

In upholding the challenged regulation, we join the Ninth Circuit, which has similarly held that the agency's inclusion of habitat destruction in the definition of "harm" is a permissible interpretation of the ESA. That Circuit has stated that "[t]he Secretary's inclusion of habitat destruction that could result in extinction follows the plain language of the statute because it serves the overall purpose of the Act...." *Palila v. Hawaii Dep't of Land and Natural Resources*, 852 F.2d 1106, 1108 (9th Cir.1988).

WILLIAMS, Circuit Judge, concurring in Section II(A)(1) of the opinion:

I agree that the "harm" regulation, 50 CFR § 17.3, complies with the Endangered Species Act—but *only* because of the 1982 amendments to the ESA. See Pub.L. 97–304, §§ 4(a)(2) and 6(1) (codified respectively at 16 U.S.C. §§ 1536(b)(4)(B) and 1539(a)(1)(B)). Those amendments, which authorize the FWS to issue permits for "any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," 16 U.S.C. § 1539(a)(1)(B), support the inference that the ESA otherwise forbids some such incidental takings, including some habitat modification. But for the 1982 amendments, I would find Judge Sentelle's analysis highly persuasive—including his discussion of the *noscitur a sociis* canon. See *RLEA v. NMB*, 988 F.2d 133, 144 (D.C.Cir.1993) (Williams, J., dissenting) (characterizing the canon as a "powerful linguistic norm").

SENTELLE, Circuit Judge, dissenting:

As we have observed, "some will find ambiguity even in a 'No Smoking' sign." *International Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. General Dynamics Land Sys. Div.*, 815 F.2d 1570, 1575 (D.C.Cir.1987). In the present case the Fish and Wildlife Service has established that it would not only find such ambiguity, but would deem a congressional authorization for the erection of "No Smoking" signs to authorize the adoption of regulations against chewing and spitting.

As Chief Judge Mikva notes, this case is governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). That decision mandates a two-step analysis. At the first step "we inquire into whether Congress has directly spoken to the precise question at issue. If we can come to the unmistakable conclusion that Congress had an intention on the precise question at issue, our inquiry ends there." *Nuclear Info. Resource Serv. v. Nuclear Regulatory Comm'n*, 969 F.2d 1169, 1173 (1992) (en banc) (citations and internal quotation marks omitted). At the second step "if the statute ... is silent or ambiguous with respect to the specific issue before us, ... we defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purpose." *Id.* (citations and internal quotation

marks omitted). While I am willing to concede the possibility that some ambiguity may remain in the unusually specific recitation by Congress of its intent in defining the term "take," I cannot cram the agency's huge regulatory definition into the tiny crack of ambiguity Congress left.

As a colleague of ours has observed, "the second prong of the *Chevron* inquiry, whether an agency's interpretation of an ambiguous statutory provision is reasonable, is also not devoid of content." *National Ass'n for Better Broadcasting v. FCC*, 849 F.2d 665, 671 n. 3 (D.C.Cir.1988) (Wald, C.J., dissenting). In the present case, I see no reasonable way that the term "take" can be defined to include "significant habitat modification or degradation" as it is defined in 50 C.F.R. § 17.3. I have in my time seen a great many farmers modifying habitat. They modify by plowing, by tilling, by clearing, and in a thousand other ways. At no point when I have seen a farmer so engaged has it occurred to me that he is taking game. Nor do I think it would occur to anyone else that he was taking wildlife. He may be doing something harmful to wildlife, but he is not "taking" it.

In my view, the fact that the farmer may be indirectly harming wildlife, and that the statutory definition includes "harm" helps the agency's cause but little. To analogize again to the smoking proposition, if Congress authorized the erection of "No Smoking" signs in public buildings and thereafter defined smoking to "include lighting, burning, puffing, inhaling, and otherwise harmfully employing the noxious nicotine-bearing tobacco products," some zealous bureau might well attempt to define smoking to include chewing and spitting under the rubric of the "harmful use" in Congress's definition of smoking. Perhaps some might think that reference to harm would cause the concept of smoking to include chewing. I do not think those creative regulators would be thinking reasonably if they should do so, nor do I think the regulators act reasonably in the present case.

As my colleague observes, there is an ancient "principle of statutory construction known as *noscitur a sociis*, a general word in a list should be interpreted narrowly 'to avoid the giving of unintended breadth to the Acts of Congress.'" Mikva Op. at 10, quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961). In the present statute, all the other terms among which "harm" finds itself keeping company relate to an act which a specifically acting human does to a specific individual representative of a wildlife species. In fact, they are the sorts of things an individual human commonly does when he intends to "take" an animal. Otherwise put, if I were intent on taking a rabbit, a squirrel, or a deer, as the term "take" is used in common English parlance, I would go forth with my dogs or my guns or my snares and proceed to "harass, ... pursue, hunt, shoot, wound, kill, trap, capture, or collect"[1] one of the target species. 16 U.S.C. § 1532(19). If I succeeded in that endeavor, I would certainly have "taken" the beast. If I failed, I would at least have "attempt[ed] to engage in ... such conduct." *Id.*

All this falls neatly within a reasonable construction of "take," just as puffing a pipe falls neatly within the definition of smoking, and I would not dare to do such in front of a "No Smoking" sign. However, I would think it most unreasonable if a regulator told me that I could not chew nicotine gum in front of the same sign because the agency had decided that it was harmful and therefore constituted smoking. It appears to me that the Fish and Wildlife Service has engaged in a similarly unreasonable expansion of terms in the present case.

I do not find the unreasonableness of the Service's construction to be in any way alleviated by the Senate Committee Report stating that "'[t]ake' is defined ... in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S.Rep. No. 93–307, 93d Cong., 1st Sess. 7 (1973), U.S.Code Cong. & Admin.News 973, 2995 (quoted by Mikva Op. at 9). Should one committee of the anti-smoking Congress have included in its discussion of the "No

---

**1.** The only word replaced by ellipses is "harm," the word under examination.

Smoking" sign authorization language to the effect that " 'smoking' is defined in the broadest possible manner to include every conceivable way in which a person can 'smoke' or attempt to 'smoke' any form of tobacco," that still would not convince me that the term could be defined to include chewing. Nor does the majority's reliance on that same sort of legislative history convince me that Congress, by mandating the broadest possible manner of definition, intended to deprive the definition of any bounds whatsoever and turn the word into a free form concept inclusive of anything an agency might wish it to cover.

I am bolstered in my conviction by another rule of statutory construction: that is, the presumption against surplusage. "[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Mackie v. Lanier Collection Agency*, 486 U.S. 825, 837, 108 S.Ct. 2182, 2189, 100 L.Ed.2d 836 (1988). The construction placed upon the word "harm" by the agency and adopted by the court today renders superfluous everything else in the definition of "take." If "harm" means any "act which actually kills or injures wildlife," including "habitat modification or degradation," I can see no reason why Congress also included in the definition of "take" the terms "harass, ... pursue, hunt, shoot, wound, kill, trap, capture, [and] collect." 16 U.S.C. § 1532(19). Every single one of those acts, particularly when coupled with further language of the congressional definition which includes "to attempt to engage in any such conduct," *id.*, falls within the definition of "harm" as understood by the agency. I am unwilling to believe that Congress deliberately wasted the considerable ink and paper devoted to the many copies of this legislation containing all the other words in section 1532(19). I am, therefore, unwilling to accept the Service's definition in the present case, no matter how well intended.

Because I would void the regulation at this early stage, I would not reach the void-for-vagueness claim. I would observe, however, that I do not see how a definition as boundless as the agency conceives for the word

"take" and the component "harm" of its definition could readily avoid being impermissibly vague.

I respectfully dissent.