**SWEET HOME CHAPTER OF COMMUNITIES FOR A GREAT OREGON, et al., Appellants,**

v.

**Bruce BABBITT, Secretary of the Interior, et al., Appellees.**

No. 92–5255.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 17, 1993.

Decided March 11, 1994.

Rehearing and Suggestion for Rehearing In Banc Denied May 2, 1994.

John A. MacLeod, with whom Steven P. Quarles and Thomas R. Lundquist, Washington, DC, were on the brief, for appellants.

Ellen J. Durkee, Attorney, Dept. of Justice, with whom Martin W. Matzen and Jean E. Williams, Attorneys, Dept. of Justice, Washington, DC, were on the brief, for appellees.

Before: MIKVA, Chief Judge, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Concurring opinion filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Chief Judge MIKVA.

STEPHEN F. WILLIAMS, Circuit Judge:

Sweet Home Chapter of Communities for a Great Oregon and a number of other organizations (collectively referred to here as "Sweet Home") sued in district court to invalidate a number of regulations promulgated by the Fish & Wildlife Service of the Interior Department under the Endangered Species Act of 1973 ("ESA" or the "Act"), 16 U.S.C. §§ 1531–44 (1988). The district court rejected all the challenges, 806 F.Supp. 279, and this court affirmed, unanimously except as to one issue. *Sweet Home Chapter v. Babbitt,* 1 F.3d 1 (D.C.Cir.1993). The issue that split the court involved the scope of the Act's prohibition of the "taking" of endangered species. On petition for rehearing, and after securing a response from the government, we alter our view on that issue.

The Act makes it a crime for any person to "take" any endangered species of fish or wildlife listed under the Act. ESA § 9(a)(1)(B), 16 U.S.C. § 1538(a)(1)(B). A definitional section of the Act states that "take" means

> to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

16 U.S.C. § 1532(19). The Fish & Wildlife Service ("FWS") has in turn defined the component term "harm" in such a way as to encompass any "significant" habitat modification that leads to an injury to an endangered species of wildlife:

> *Harm* in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral

patterns, including breeding, feeding or sheltering.

50 CFR § 17.3.

The government contends that the Act as originally adopted in 1973 authorized this expansive definition, and that even if it did not, a 1982 amendment to another provision of the ESA, specifically § 10(a)(1)(B) of the Act, 16 U.S.C. § 1539(a)(1)(B), either so changed the context of the "take" definition as to validate the Service's definition, or at any rate ratified that definition.

On petition for rehearing, we reject both theories. We find that the Service's definition of "harm" was neither clearly authorized by Congress nor a "reasonable interpretation" of the statute, see *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 844, 104 S.Ct. 2778, 2781–82, 2782, 81 L.Ed.2d 694 (1984), and we find that no later action of Congress supplied the missing authority.

*The language, structure and legislative history of the 1973 Act*

 The Fish & Wildlife Service found habitat modification within the idea of "harm", the most elastic of the words Congress used to define the acts that § 9 of the ESA forbids private individuals to commit. The potential breadth of the word "harm" is indisputable. In *Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), for example, the Supreme Court, in exploring the just compensation requirement of the 5th Amendment, observed that "the distinction between 'harm-preventing' and 'benefit-conferring' regulations is often in the eye of the beholder." *Id.* —— U.S. at ——, 112 S.Ct. at 2897. As a matter of pure linguistic possibility one can easily recast any withholding of a benefit as an infliction of harm. In one sense of the word, we "harm" the people of Somalia to the extent that we refrain from providing humanitarian aid, and we harm the people of Bosnia to the extent that we fail to stop "ethnic cleansing". By the same token, it is linguistically possible to read "harm" as referring to a landowner's withholding of the benefits of a habitat that is beneficial to a species. A farmer who harvests crops or

trees on which a species may depend harms it in the sense of withdrawing a benefit; if the benefit withdrawn be important, then the Service's regulation sweeps up the farmer's decision.

The immediate context of the word, however, argues strongly against any such broad reading. With the single exception of the word "harm", the words of the definition contemplate the perpetrator's direct application of force against the animal taken: "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect". The forbidden acts fit, in ordinary language, the basic model "A hit B."

For some of the words, to be sure, the application of force may not be instantaneous or immediate, and the force may not involve a bullet or blade. In the case of "pursue", the perpetrator does not necessarily catch or destroy the animal, but pursuit would always or almost always be a step toward deliberate capture or destruction, and so would be picked up by § 1532(19)'s reference to "attempt[s]". While one may "trap" an animal without being physically present, the perpetrator will have previously arranged for release of the energy that directly captures the animal. And one may under some circumstances "harass" an animal by aiming sound or light in its direction, but the waves and particles are themselves physical forces launched by the perpetrator. Interpreting "harass" in the Marine Mammal Protection Act, where it appears as one of the components of "take" (defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal"), the 9th Circuit applied *noscitur a sociis,* saying:

> The statute groups "harass" with "hunt," "capture," and "kill" as forms of prohibited "taking." The latter three each involve direct, sustained, and significant intrusions upon the normal, life-sustaining activities of a marine mammal; killing is a direct and permanent intrusion, while hunting and capturing cause significant disruptions of a marine mammal's natural state. Con-

sistent with these other terms, "harassment," to constitute a "taking" under the MMPA, must entail a similar level of direct and sustained intrusion.

*United States v. Hayashi,* 5 F.3d 1278, 1282 (9th Cir.1993). Accordingly the court overturned the defendant's conviction. Although he had fired a rifle twice into the water behind some porpoises, he had not harassed the porpoises within the meaning of the statute, as his acts were not "direct and significant intrusions upon the mammal's ordinary activities." *Id.* Here, the nine verbs accompanying "harm" all involve a substantially direct application of force, which the Service's concept of forbidden habitat modification altogether lacks.[1]

The implications of the Service's definition suggest its improbable relation to congressional intent. Species dependency may be very broad. One adherent of aggressive protection, for instance, notes that "[s]ome scientists believe as many as 35 million to 42 million acres of land are necessary to the survival of grizzlies", about as much land in the northern Rockies of the United States and Canada as is still usable grizzly habitat. Rocky Barker, *Saving All the Parts* 34 (1993). And for an individual to "knowingly" violate § 9 means criminal penalties of up to a $100,000 fine and imprisonment for one year. See 16 U.S.C. § 1540(b); 18 U.S.C. §§ 3559(a)(6), 3571(b) and (e) (raising the maximum penalty).

Thus the gulf between the Service's habitat modification concept of "harm" and the other words of the statutory definition, and the implications in terms of the resulting extinction of private rights, counsel application of the maxim *noscitur a sociis.* "The maxim *noscitur a sociis,* that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961). See also

1. Of course each of the terms in the "take" definition itself implies some degree of habitat modification. Setting a trap for an animal certainly modifies its habitat, as in a slightly differ-

ent sense, does firing bullets at it. This obviously does not imply that habitat modifications as the Service uses the term are also encompassed.

*Dole v. Steelworkers*, 494 U.S. 26, 36, 110 S.Ct. 929, 935, 108 L.Ed.2d 23 (1990) ("words grouped in a list should be given related meaning") (citations omitted).[2] The Service's interpretation appears to yield precisely the "unintended breadth" that use of the maxim properly prevents.

The structure and history of the Act confirm this reading. The ESA pursues its conservation purposes through three basic mechanisms: (1) a federal land acquisition program, ESA § 5, 16 U.S.C. § 1534; (2) the imposition of strict obligations on federal agencies to avoid adverse impacts on endangered species, ESA § 7, 16 U.S.C. § 1536; and (3) a prohibition on the taking of endangered species by anybody, ESA § 9, 16 U.S.C. § 1538. The Act addresses habitat preservation in two ways—the federal land acquisition program and the directive to federal agencies to avoid adverse impacts. The latter frames the duty in terms that the Service has now transposed to the private anti-"take" provision: every such agency is to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in *the destruction or adverse modification of habitat* of such species which is determined ... to be critical", unless an exemption is granted. 16 U.S.C. § 1536(a)(2) (emphasis added). Thus, on a specific segment of society, the federal government, the Act imposes very broad burdens, including the avoidance of adverse habitat modifications; on a broad segment, every person, it imposes relatively narrow ones.

The legislative history reflects this balance, and confirms the intention to assign the primary task of habitat preservation to the government. Explaining the land acquisition program, Senator Tunney, the Senate floor manager for the ESA, stated: "Through these land acquisition provisions, we will be able to conserve habitats necessary to protect fish and wildlife from further destruction." 119 Cong.Rec. 25669 (July 24, 1973). Representative Sullivan, the floor manager

for H.R. 37—the House version of the bill—confirmed this approach:

> For the most part, the principal threat to animals stems from the destruction of their habitat. The destruction may be intentional, as would be the case in clearing of fields and forests for development of resource extraction, or it may be unintentional, as in the case of the spread of pesticides beyond their target area. Whether it is intentional or not, however, the result is unfortunate for the species of animals that depend on that habitat, most of whom are already living on the edge of survival. *H.R. 37 will meet this problem by providing funds for acquisition of critical habitat through the use of the land and water conservation fund.* It will also enable the Department of Agriculture to cooperate with *willing landowners* who desire to assist in the protection of endangered species, but who are understandably unwilling to do so at excessive cost to themselves.

119 Cong.Rec. 30162 (Sept. 18, 1973) (emphasis added). For habitat modification, then, Representative Sullivan saw the Act as providing duties for the government, with private persons acting only in the form of "willing landowners" assisted by the Department of Agriculture.

The floor managers differentiated loss of habitat from the hazard that was the target of the "taking" ban and the other prohibitions of § 9. After the passage quoted, Representative Sullivan went on to identify "*[a]nother* hazard to endangered species" which "arises from those who would capture or kill them for pleasure or profit. There is no way that the Congress can make it less pleasurable for a person to *take* an animal, but we can certainly make it less profitable for them to do so." *Id.* (emphasis added). Senator Tunney drew the same line:

> Although most endangered species are threatened primarily by the destruction of their natural habitats, a significant portion of these animals are subject to *predation*

---

**2.** "One hardly need rely on such Latin phrases as *ejusdem generis* and *noscitur a sociis* to reach this obvious conclusion [that "words grouped in a list should be given related meaning"]." *Third Na-*

*tional Bank v. Impac Limited, Inc.,* 432 U.S. 312, 322 n. 16, 97 S.Ct. 2307, 2313 n. 16, 53 L.Ed.2d 368 (1977) (internal quotations omitted).

*by man for commercial, sport, consumption, or other purposes.* The provisions in S. 1983 would prohibit the commerce in or the importation, exportation, or taking of endangered species except where permitted by the Secretary.

119 Cong.Rec. 25669 (July 24, 1973) (emphasis added).

Congress's deliberate deletion of habitat modification from the definition of "take" strengthens our conclusion. As introduced before the Senate Commerce Committee, S. 1983 defined "take" as including "the destruction, modification, or curtailment of [a species'] habitat or range." Endangered Species Act of 1973: Hearings on S. 1592 and S. 1983 Before the Subcomm. on Environment of the Senate Comm. on Commerce, 93d Cong., 1st Sess., at 27 (1973). A number of persons appearing before the Subcommittee on Environment explicitly endorsed this language and stressed its importance. See, e.g., testimony of John Grandy of the National Parks and Conservation Association, *id.* at 86; testimony of Tom Garrett, Wildlife Director of Friends of the Earth, *id.* at 104. Senators made the same point. See statement of Senator Moss, *id.* at 113; statement of Senator Williams, *id.* at 116. But the "take" definition of the version of S. 1983 submitted to the Senate omitted any reference to habitat modification, defining "take" to mean "harass, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." See 119 Cong. Rec. 25663 (July 24, 1973). In rejecting the Service's understanding of "take" to encompass habitat modification, "we are mindful that Congress had before it, but failed to pass, just such a scheme." *John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank,* —— U.S. ——, ——, 114 S.Ct. 517, 526, 126 L.Ed.2d 524 (1993).

#### The effect of the 1982 amendments

Congress amended the Act in 1982, with two possible implications. First, one might argue that one of the amendments so altered the *context* of the definition of "take" as to render the Service's interpretation reasonable, or even, conceivably, to reflect express congressional adoption of that view. Second,

one might argue that the process of amendment, which brought the Service's regulation and a judicial endorsement to the attention of a congressional subcommittee, constituted a ratification of the regulation. We reject both theories.

1. The only legislative *act* from which the government claims support is the addition of ESA § 10(a)(1)(B), 16 U.S.C. § 1539(a)(1)(B), which authorizes the FWS to issue permits for "any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." This language clearly implies that *some* prohibited takings are "incidental" to otherwise lawful activities. It does not follow, however, that such incidental takings include the habitat modifications embraced by the Service's definition of "harm". Harms involving the direct applications of force that characterize the nine other verbs of § 1532(19) pose the problem of incidental takings. The trapping of a nonendangered animal, for example, may incidentally trap an endangered species.

In fact, the key example of the sort of problem to be corrected by § 10(a)(1)(B) involved the *immediate destruction* of animals that would be *trapped* by a human enterprise. Northeast Utilities reported that it had sought to construct a nuclear plant on the Connecticut River. Dr. John P. Cagnetta explained on behalf of Northeast that the "EPA had concluded that Section 9 of the Act constituted a '*zero taking*' rule which would prohibit the *entrainment or impingement* of *any* Shortnose Sturgeon eggs, larvae or adults by the Montague intake structure." Endangered Species Act of 1973: Hearings Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the House Comm. on Merchant Marine and Fisheries ("Hearings"), 97th Cong., 2d Sess., at 358 (1982) (emphasis added). The "entrainment" and "impingement" of sturgeon eggs involve the crushing or capture of the eggs as a direct result of a human enterprise, just as would nets that catch fish driven in their way by the tides.

The sort of advance conservation plan authorized by § 10(a) makes complete sense for the kind of incidental taking exemplified by

Northeast's dilemma. Dr. Cagnetta expressed concern that after the firm had invested $2 billion in the proposed plant, it might be subject to closure by injunction granted at the behest of a private person. *Id.* at 359. Section 10(a) provides procedural means by which to improve the trade-off between protecting endangered species and permitting normal development. Firms whose activities might incidentally "take" members of an endangered species can get *advance* protection from legal liability, but only if they convince the Secretary that the plan uses the maximum devices possible to mitigate and minimize species loss, and that the resulting losses will not unduly harm the species. See § 10(a)(2)(B)(ii) & (iv), 16 U.S.C. § 1539(a)(2)(B)(ii) & (iv).

■ Thus, adoption of § 10(a)'s permit plan, at least as evidenced by Northeast's instigating role, arose from interpretive assumptions about the meaning of "taking"— namely the EPA's views (1) that the perpetrator need not have *intended* to take the creature in question, and (2) that even the slightest taking would violate the Act (the "zero taking" rule). We need not explore the possible impact of these assumptions on the interpretation of "take"; a member of Congress might have supported the permit system on a completely agnostic premise about those interpretations: "There are some pretty wild interpretations out there, and they may stick; if they do, it would certainly be helpful to have a mechanism for softening their impact." Normally, erroneous legislative assumptions about the meaning of an existing statute, even when they serve as the premise of an amendment, do not alter the meaning of unamended provisions. See *Mackey v. Lanier Collection Agency & Serv.,* 486 U.S. 825, 840, 108 S.Ct. 2182, 2191, 100 L.Ed.2d 836 (1988). Here, however, the matter is even easier, as the amendment involved no assumptions supporting the Service's position on habitat modification. So far as the creation of the permit plan is concerned, the implicit assumptions simply do not embrace the idea that "take" included any significant habitat modification injurious to wildlife.

2. For its ratification theory, the government invokes (besides the § 10(a)(2) amendment itself) (a) language in the Conference on the 1982 amendments; (b) notice to a House subcommittee of the Service's habitat modification regulation and of a decision upholding it; and (c) the decision of a senator *not* to offer an amendment. We first examine these and then consider the cases on ratification of mistaken interpretations, on the basis of congressional awareness and peripheral action.

(a) *The Conference Report.* The government highlights some observations of H.R.Rep. No. 835, 97th Cong., 2d Sess. (1982) ("Conference Report"), 1982 U.S.C.C.A.N. 2807, speaking of the innovation made by § 10(a):

> This provision is modeled after a *habitat conservation plan* that has been developed by three Northern California cities, the County of San Mateo, and private landowners and developers to provide for the conservation of the habitat of three endangered species and other unlisted species of concern within the San Bruno Mountain area of San Mateo County.
>
> This provision will measurably reduce conflicts under the Act and will provide the institutional framework to permit cooperation between the public and private sectors in the interest of endangered species and *habitat conservation.*
>
> The terms of this provision require a unique partnership between the public and private sectors in the interest of species and *habitat conservation....*

*Id.* at 30–31, *reprinted in* 1982 U.S.C.C.A.N. 2871–72 (emphasis added).

Although the passage thrice uses the phrase "habitat conservation", the first reference simply describes the particular plan on which the provision was modeled, while the second and third couple the phrase with, respectively, "the interest of endangered species" and "the interest of species." The focus is on the flexibility of the *relief* offered. The expectation that *relief* under the § 10(a) permit scheme would include habitat conservation does not imply an assumption that *takings* encompass habitat modification. Thus, if a nuclear plant will "entrain" and "impinge" sturgeon eggs, the area where this occurs will certainly not be hospitable for the

sturgeon, and mitigation measures invited by § 10(a) might well include provision of alternative habitat. Similarly, although § 10(a) relief contemplates advancing "the interest of endangered species", it does not follow that every act detrimental to an endangered species constitutes a forbidden taking.

(b) *Notice of the regulation.* The Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries had notice of the regulation. See, e.g., Hearings at 290. In addition, speakers brought a decision of the 9th Circuit upholding the application of the ESA to habitat modification, *Palila v. Hawaii Dep't of Land & Natural Resources,* 639 F.2d 495 (9th Cir.1981), to the attention of subcommittee members in attendance. See Hearings at 329, 331. See also *id.* at 331, 426 (expressions of conflicting views on validity of interpretation of "harm" to encompass habitat modification). So far as appears, no congressional awareness of the Service's regulation or of *Palila* reached the floor of either House.

(c) *The withdrawn amendment.* The government says that Senator Garn proposed an amendment to change the definition of "take" but "withdrew it voluntarily because he realized it did not have enough support for passage." Appellee Brief at 32. This falsely suggests a focus on "habitat modification" that was simply not there. In fact, the amendment that Senator Garn withdrew was not an isolated redefinition of the term "take", but a wholesale "rewrite" of the ESA[3]—the reading of which was dispensed with on the Senate floor, and the text of which took 16 dense pages of legislative history. *A Legislative History of the Endangered Species Act of 1973, As Amended in 1976, 1977, 1978, 1979, and 1980* (U.S.Govt.1982) at 1080. The record reveals nothing to suggest any relation between Senator Garn's decision and congressional sentiment on the habitat modification issue.

By what standard are these features of the 1982 amendment process to be evaluated? Although the precedents are hardly in perfect harmony, the Supreme Court has generally refused to infer ratification from mere amendment of adjacent clauses in these circumstances. It has forcefully articulated reasons for this refusal. In *Girouard v. United States,* 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946), the Court concluded that it had erred in three prior cases holding that an alien who refused to bear arms could not be admitted to citizenship under the terms of the oath prescribed by Congress for naturalization. *Id.* at 61–69, 66 S.Ct. at 826–830. It then confronted a claim that Congress had impliedly adopted the rule of the earlier decisions, a claim to which the facts lent considerable support—*unsuccessful* efforts to change the rule, plus *reenactment* of the underlying language amid *change* of many related provisions. *Id.* at 69, 66 S.Ct. at 829 (emphasis added).

In dissent, Chief Justice Stone set out the principle that where a statutory provision has been subject to a controversial construction, reenactment without change implies congressional approval of that construction. *Id.* at 76, 66 S.Ct. at 833 (Stone, C.J., dissenting). The court, however, rejected this approach, and warned "[i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *Id.* at 69, 66 S.Ct. at 830. It observed that congressional silence and inaction—actually, reenactment of the pertinent language—were "as consistent with a desire to leave the problem fluid as they are with an adoption by silence of the rule of [the prior] cases." *Id.* at 70, 66 S.Ct. at 830.

Similarly, where Congress adopts amendments on the basis of a misconception as to the meaning of a prior statute's related provisions, the later act does not turn the misconception into law. *Mackey v. Lanier Col-*

---

**3.** Senator Garn's proposed amendment included the following redefinition:

The term "take" means purposefully to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct which is inimical to the continued existence of an endangered or threatened species. It does not include effects from normal forestry, farming, ranching, or water management practices.

*A Legislative History of the Endangered Species Act of 1973, As Amended in 1976, 1977, 1978, 1979, and 1980* (U.S.Govt.1982) at 1082.

*lection Agency & Serv.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), illustrates the principle. As originally enacted, the Employee Retirement Income Security Act ("ERISA") preempted state laws "as they may now or hereafter relate to any employee benefit plan" covered by the statute. ERISA § 514(a), 29 U.S.C. § 1144(a). After a number of lower courts construed § 514(a) to preempt state garnishment statutes, Congress in 1984 expanded the statutory list of exceptions to § 514(a), adding garnishments in support of domestic relations orders and thereby expressly eliminating ERISA's preemption of that narrow category. See ERISA § 514(b)(7), 29 U.S.C. § 1144(b)(7). Though the Court recognized that language in the House Committee report "suggest[ed] that the House Committee in 1984 thought that § 514(a) foreclosed state-law attachment orders akin to those at issue here", *id.* at 840, 108 S.Ct. at 2191, i.e., garnishments outside the area of domestic relations, it refused to attach weight to that implicit suggestion. Rather, the Court said that "these views—absent an amendment to the original language of the section—do not direct our resolution of this case. Instead, we must look at the language of ERISA and its structure, to determine the intent of the Congress that originally enacted the provision in question. 'It is the intent of the Congress that enacted [the section] ... that controls.' *Teamsters v. United States*, 431 U.S. 324, 354, n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977)." *Id.*

And in *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), the Supreme Court refused to find implied ratification even though Congress amended closely related statutory sections and the Conference Report appeared to support the prevailing interpretation. The Court had, in *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), construed certain provisions of the Securities Act of 1933 to bar enforcement of pre-dispute agreements to arbitrate for disputes under § 12(2) of that act, despite the broad endorsement of arbitration in the previously adopted Federal Arbitration Act, 9 U.S.C. § 1 et seq. The issue in *Shearson/American Express* was whether similar provisions in

the Securities Exchange Act of 1934 prevented enforcement of a pre-dispute arbitration agreement as to an alleged violation of § 10(b) of that Act, as the circuit courts of appeal had generally held.

After finding that the 1934 Act as originally enacted created no exception to the Arbitration Act, the Court turned to whether a later congressional intervention, the 1975 amendments to both the 1933 and the 1934 Acts—"the 'most substantial and significant revision of this country's Federal securities laws since the passage of the Securities Exchange Act in 1934'", *Shearson/American Express*, 482 U.S. at 246, 107 S.Ct. at 2347 (Blackmun, J., dissenting)—altered that result. The 1975 amendments included a change in a section of the 1934 Act (§ 28(b)) closely related to those sections from which lower courts had drawn the inference against pre-dispute arbitration clauses, and the Conference Report had in connection with that change virtually endorsed *Wilko v. Swan:*

> It was the clear understanding of the conferees that this amendment did not change existing law, as articulated in *Wilko v. Swan*, 346 U.S. 427 [74 S.Ct. 182, 98 L.Ed. 168] (1953), concerning the effect of arbitration proceedings provisions in agreements entered into by persons dealing with members and participants of self-regulatory organizations.

H.R.Conf.Rep. No. 94–229 at 111 (1975), 1975 U.S.C.C.A.N. pp. 179, 342 (1975) (quoted at *Shearson/American Express*, 482 U.S. at 236–37, 107 S.Ct. at 2343).

To Justice Blackmun, dissenting for himself and Justices Brennan and Marshall, this showed that Congress was clearly aware of the extension of *Wilko* to the 1934 Act and, at a minimum, that it was "not concerned with arresting this trend." 482 U.S. at 247, 107 S.Ct. at 2348. But the majority, although finding some ambiguities in the remarks of the Conference Report, stressed the absence of any affirmative action by Congress in regard to the controlling sections: "We cannot see how Congress could extend *Wilko* to the [1934] Act without enacting into law any provision remotely addressing that subject." *Id.* at 237, 107 S.Ct. at 2343.

A variant on this theme is *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), involving claims that Congress's several appropriations for the Tellico Dam, made with full awareness of its risks to the snail darter and with express statements in various House and Senate Appropriations Committees' reports that the ESA was not meant to apply to this project, effectively exempted the dam from § 7 of the Act. Despite Congress's endorsement of the disputed project with the ultimate accolade—hard cash—the Court refused to find any exemption. *Id.* at 189–93, 98 S.Ct. at 2299–2301. The Court underscored the proposition that only congressional *committees* had expressed the understanding of § 7 that contradicted the Court's reading. *Id.* at 189, 193, 98 S.Ct. at 2299, 2301.

Our own decision in *State of Ohio v. U.S. Department of the Interior*, 880 F.2d 432 (D.C.Cir.1989), elaborates on the jurisprudential concerns raised by *Shearson/American Express*. The court considered a situation where Congress had amended the key sections being construed *and* had reenacted the entire statute. Judge Wald wrote for the court:

> Were we to infer congressional approval of Interior's rules because it did not amend the statute to explicitly repudiate them, we would in effect be insisting that a Congress legislatively reiterate an already clear statutory command in order to fend off an impermissible interpretation. As we all know, many statutes are on the books for which no congressional majority could presently be garnered *either* to reenact *or* to repeal, yet those acts continue as valid law; indeed, a canon of equal worth with the acquiescence-by-reenactment rule is the one disfavoring repeal by implication. We conclude that the acquiescence-by-reenactment rule is not applicable to a situation where the regulations violate the original statutory language and where Congress' decision not to amend the relevant statutory provisions evidently stems from a belief that the provisions have been clear all along.

*Id.* at 458–59. Although the court evidently understood congressional inaction to stem

from a belief that the statute had been "clear all along" (*against* the administrative interpretation), the ambiguity we pinpointed is relevant more broadly. Congressional inaction may indicate no more than the press of other business. As inaction is inadequate to *repeal* a law, it should be inadequate to *modify* a law. Yet modification is required to sustain an interpretation that is invalid as against the original legislation. Professor Tribe has pointed out that judicial reliance on congressional silence generates an elaborate buck-passing. The courts pass the buck to Congress by invoking the congressional inaction, and individual members of Congress can freely pass the buck back by pointing to the courts' action. See Laurence H. Tribe, *Constitutional Choices* 33–34 (1985).

We do not pretend that the Court's treatment of this issue has been absolutely uniform. There are cases indicating some readiness to infer ratification merely from amendment of related provisions (coupled with acute congressional focus on outstanding interpretations), and even from mere notice followed by inaction. In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), for example, the Court considered the Corps of Engineers' broad reading of "waters of the United States" in the 1972 Clean Water Act, and placed some weight on Congress's 1977 failure—in the course of making important amendments and after extensive floor debate—to modify the Corps's interpretation. "Although we are chary of attributing significance to Congress' failure to act, a refusal by Congress to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction, particularly where the administrative construction has been brought to Congress' attention through legislation specifically designed to supplant it." *Id.* at 137, 106 S.Ct. at 464. In *Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), the Court attached weight to the fact of Congress's awareness of IRS rulings that barred tax-exempt status for racially discriminatory schools, noting that 13 bills had been introduced over the years to overturn the rulings, none ever emerging from committee. *Id.* at 600, 103 S.Ct. at 2033. But the Court

also observed that "[n]onaction by Congress is not often a useful guide". *Id.* More important, perhaps, Congress itself had, over the same period, adopted anti-discrimination prerequisites for private club exemptions, a closely parallel issue with obvious implications for the meaning of the general language exempting charitable and educational institutions. *Id.* at 601–02, 103 S.Ct. at 2033–34. And in *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), the Court broadly suggested that congressional "revisit[ations]" of a statute after a longstanding administrative interpretation, coupled with failure to modify the interpretation, suggested support for the agency view. *Id.* at 846, 106 S.Ct. at 3254. But in *Schor* the Court found the rejected reading of the statute inconsistent with the statutory language, *id.* at 841–42, 106 S.Ct. at 3251–52, and fraught with incongruities, see *id.* at 843–44, 106 S.Ct. at 3252–53, and also read the later amendments as "explicitly affirm[ing]" the agency's view, *id.* at 846, 106 S.Ct. at 3254.

These cases may ultimately not be fully reconcilable. We note, however, that the cases drawing inferences from inaction typically fail to address the serious jurisprudential problems of doing so—especially those captured in Judge Wald's observation that there are plenty of statutes "on the books for which no congressional majority could presently be garnered *either* to reenact *or* to repeal". *State of Ohio,* 880 F.2d at 458. It hardly seems consistent to enforce such statutes yet to accept non-amendment of an interpretation as the equivalent of congressional endorsement.

*If* the 1982 Congress had *reenacted* the pertinent sections of the ESA *and* "voice[d] its approval" of the FWS's interpretation, it might be appropriate to treat the reenactment as an adoption of that interpretation. *United States v. Bd. of Commissioners,* 435 U.S. 110, 134, 98 S.Ct. 965, 980, 55 L.Ed.2d 148 (1978). But see *Girouard.* Here, however, Congress neither reenacted the sections having to do with "take", nor "voiced its approval" of the harm regulation. As we have seen, its creation of the permit scheme is fully consistent with the meaning of "take"

as enacted in 1973; the other developments show no more than awareness of the Service's view, its survival in *Palila,* and the absence of any action to endorse or repudiate those developments.

\* \* \*

Accordingly, we hold invalid the Fish & Wildlife Service regulation defining "harm" to embrace habitat modifications. The judgment of the district court is reversed to that extent; otherwise, the judgment of this court in *Sweet Home Chapter v. Babbitt,* 1 F.3d 1 (D.C.Cir.1993), is unaltered.

*So ordered.*

SENTELLE, Circuit Judge, concurring:

As I remain of the view expressed in my dissent in the original version of this case, *Sweet Home Chapter v. Babbitt,* 1 F.3d 1, 11 (D.C.Cir.1993) (Sentelle, J., dissenting), that the word "harm" in the context of the definition of "taking" in the Endangered Species Act of 1973 cannot reasonably be defined to include the broadly prohibited habitat modification encompassed in the challenged regulation, I am most pleased to concur in the decision of the Court. Now as then I find the words and structure of the Act sufficiently clear as to require no resort to legislative history. I therefore join with enthusiasm those portions of Judge Williams's opinion that rely on the structure of the Act and on the maxim of *noscitur a sociis.* I further note, as I did in my earlier dissent, that to define "harm" as broadly as does the Secretary is to render all other words in the statutory definition of "taking" superfluous in violation of the presumption against surplusage: "[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." 1 F.3d at 13 (quoting *Mackey v. Lanier Collection Agency & Serv.,* 486 U.S. 825, 837, 108 S.Ct. 2182, 2189, 100 L.Ed.2d 836 (1988)).

In view of the language and structure of the Act, and the principles of construction applied by Judge Williams and in my earlier dissent, I do not find it necessary to rely on the legislative history incorporated in Judge Williams's opinion. "[A]ppeals to statutory

history are well taken only to resolve statutory ambiguity." *Barnhill v. Johnson*, —— U.S. ——, ——, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39 (1992) (internal quotation omitted). As the Supreme Court recently observed, "we do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, —— U.S. ——, ——, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994). Because I find the meaning of "take" in the statute to be sufficiently clear that "I cannot cram the agency's huge regulatory definition" into any "tiny crack of ambiguity Congress left," 1 F.3d at 12. I concur in the decision to reverse the District Court judgment in part, but I would do so without resort to the legislative history.

MIKVA, Chief Judge, dissenting:

The majority's decision in this case is unfortunate. It scuttles a carefully conceived Fish and Wildlife Service ("FWS") regulation and creates a split in the circuits on an important statutory question. Despite the significance of the issue presented in this case, the majority insists on granting rehearing and reversing its earlier opinion without the benefit of additional oral argument, and without the benefit of additional briefing tailored to the court's concerns. What was rightly considered good law in the opinion in this case issued last year, published at 1 F.3d 1 (D.C.Cir.1993), is now "altered" on the basis of a confusing and misguided legal analysis that creates a needless conflict among the circuits. I dissent.

## A. Standard of Review

The majority's first, and biggest, mistake is to jettison the *Chevron* standard. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Only once does the majority mention *Chevron*, conceding that it is supposed to govern our review of this case. But the majority concludes that the FWS's regulation is infirm under *Chevron* because "the Service's definition of 'harm' was neither clearly authorized by Congress nor a 'reasonable interpretation' of the statute." Maj. op. at 1464.

But the standard of review that we are bound to apply under *Chevron* actually reads as follows:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted).

Plainly, *Chevron* does not place the burden on the responsible agency to show that its interpretation is clearly authorized or reasonable. On the contrary, the burden is on the party seeking to overturn such an interpretation to show that Congress has clearly spoken *to the contrary*, or that the agency's interpretation is *un*reasonable. The whole point of *Chevron* deference is that when Congress has *not* given a clear command, we presume that it has accorded discretion to the agency to clarify any ambiguities in the statute it administers. In requiring the agency to justify its regulation by reference to such a clear command, the majority confounds its role. Ties are supposed to go to the dealer under *Chevron*.

Along with (and perhaps because of) this backwards reading, the majority also fails to note which step of *Chevron* is dispositive of the case. If it is step one, the majority must show that Congress has "directly spoken to the precise question at issue": whether the word "harm" includes "significant habitat modification [that] actually kills or injures wildlife." Surely the statute is silent, or at

best ambiguous, on this question. The Endangered Species Act ("ESA") nowhere defines "harm," and nowhere specifically prohibits the extension of that term to habitat modification. Under step two, the only question is whether the FWS's interpretation of the word "harm" constitutes a "permissible" reading of the ambiguous language. The question is *not*—however much the majority might like it to be—whether we think it constitutes the best reading. Under step two, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, *or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.*" *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11 (emphasis added).

### B. Applying Chevron

Despite the command of *Chevron*, the majority substitutes its own favorite reading of the Endangered Species Act for that of the agency. But *Chevron* makes it irrelevant whether the majority's preferred interpretation is better than the agency's; the only question is the reasonableness of the agency's interpretation. And a fair reading allows for no other conclusion than that the agency's interpretation is reasonable.

The place to start is the statutory language. The ESA makes it unlawful to "take" a member of a species of fish or wildlife designated as "endangered" by the FWS. 16 U.S.C. § 1538(a)(1)(B). "Take" is a defined term, meaning "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The regulation at issue in this case purports to define the term "harm" as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife...." 50 C.F.R. § 17.3. It is this definition that the majority finds unreasonable.

The majority relies primarily upon *noscitur a sociis*, a seldom-invoked principle of statutory construction. According to this canon, when a potentially broad word ap-

pears in a definition along with a list of narrow words, the broad word should be read narrowly to conform with its companions. This the majority purports to do here, finding that all the words in the definition of "take," other than the crucial word "harm," involve a "direct application of force." Ipso facto, the word "harm" must also be read to require a direct application of force, and habitat modification is not sufficiently direct to fall within this definition of "harm."

To this display of reasoning by the majority, one is tempted to respond, "Watch that first step; it's a big one." The definition of "take" does not conform to the paradigm of one broad word alongside many narrow ones, and thus the majority's decision to apply *noscitur a sociis* is fatally flawed. Instead, "take" includes several words that might be read as broadly, or nearly as broadly, as "harm": especially "harass," "wound," and "kill." Indeed, as the regulation at issue defines "harm" as an act (including habitat modification) that "actually kills or injures wildlife," the FWS might as easily have derived a proscription of habitat modification from the words "kill," "wound," and "harass," as from the word "harm."

In fact, the House Report specifically comments upon the breadth of the ESA's prohibition of "harassment," stating:

> ["Take"] includes harassment, whether intentional or not. This would allow, for example, the Secretary to regulate or prohibit the activities of birdwatchers where the effect of those activities might disturb the birds and make it difficult for them to hatch or raise their young.

H.R.Rep. No. 93–412, 93rd Cong. 1st Sess. 11 (1973). Accordingly, FWS has defined the term "harass" nearly as broadly as the term "harm":

> *Harass* in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering.

50 C.F.R. § 17.3. Appellants have not challenged this definition.

A more limited definition of "harass" was required (if at all) in *United States v. Hayashi*, 5 F.3d 1278 (9th Cir.1993), only because the word "harm" does not appear alongside "harass" in the Marine Mammal Protection Act; the only accompanying terms are "hunt," "capture," and "kill." 16 U.S.C. § 1362(13). By contrast, the ESA also includes the more expansive "harm," "wound," and "pursue," and is clearly meant to proscribe a broader range of activity. The 9th Circuit, the same court that decided *Hayashi*, has itself reached that conclusion, *Palila v. Hawaii Dep't of Land and Natural Resources*, 852 F.2d 1106, 1107–09 (9th Cir. 1988) (agency's interpretation of "harm" to include significant habitat modification is consistent with the language, purpose, and legislative history of the ESA), and today's contrary decision thus creates a foolish circuit conflict.

*Noscitur a sociis* means that a word is known by the company it keeps. *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961). In the definition of "take," the term "harm" is accompanied by an assortment of words ranging from the precise and narrow "shoot" to the vague and expansive "harass." Gratuitous references to our nation's foreign policy aside, *see* Maj. Op. at 1464, "harm" is not a single elastic word among many ironclad ones but an ambiguous term surrounded by other ambiguous terms. Consequently, even if it is ever appropriate to measure an agency's construction of a statute against a seldom-used and indeterminate principle of statutory construction, this is not the place for *noscitur a sociis*.

Equally inappropriate is Judge Sentelle's use of the presumption against surplusage. There is no reasonable definition of the word "harm" (or, for that matter, the word "harass") that would not render superfluous some of the other defined terms. For example, one cannot "kill" or "wound" an animal without also "harming" it, even under the narrowest conceivable interpretation of "harm." Does that mean we must read "harm" out of the statute altogether? That

would hardly be faithful to Congress's intent, which was to define takings "in the broadest possible manner to include any conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S.Rep. No. 93–307, 93rd Cong., 1st Sess. 7 (1973), 1973 U.S.C.C.A.N. pp. 2989, 2995. No, instead it means we must uphold the agency's reasonable accommodation of all the statutory terms. Defining "harm" to include "significant habitat modification" renders no more terms superfluous than would a definition that did not include habitat modification but did include "direct" forms of killing and wounding. And indeed, the majority's holding that "harm" cannot include indirect means of injuring wildlife may render "harm" itself superfluous, or nearly so, as "direct" means of injury are well covered by the other terms. The plain language of the statute, then, lends no support to the majority's contention that the FWS's interpretation of "harm" is impermissible.

The statute's purpose and legislative history provide equally insufficient grounds for rejecting the agency's interpretation. The majority, adopting the view of the appellants in this case, acknowledges that Congress intended to halt injurious habitat modification when it passed the ESA. It contends that Congress intended to combat this problem solely through § 1534's provision for federal land acquisition, and not through § 1538's prohibition of private takings.

According to the majority, the legislative history of the "take" provision establishes that Congress did not mean for that term to encompass habitat modification. It notes that the original bill that was referred to the Senate Committee on Commerce, S. 1983, defined "take" to include "destruction, modification, or curtailment of [an endangered species'] habitat or range." S. 1983, 93rd Cong., 1st Sess. § 3(6) (1973). The bill reported out of committee, however, did not refer to habitat modification in the definition of "take." This omission, the majority finds, evinces Congress's intent not to include habitat modification within the scope of protected "takings." The majority also points to several statements from the floor suggesting that some members of Congress may have want-

ed land acquisition, not the prohibition of land uses, to be the ESA's sole weapon against habitat modification on private lands.

I find the legislative history to be most ambiguous regarding whether Congress intended to include habitat modification within the meaning of "take." It is true that the Senate Committee chose not to use the S. 1983 definition of "take," which specifically encompassed habitat modification. Instead, the Committee adopted a definition from the other bill under consideration, S. 1592, which did not explicitly include habitat modification. But as the district court noted, there is no indication in the legislative history as to why the Committee selected one definition over the other. And, in any event, the crucial word "harm" was never voted on by the Committee but was added later on the floor of the Senate. It might well have been intended to cover the entire landscape originally contemplated by the S. 1983 definition. *See* 119 Cong.Rec. 25,683 (July 24, 1973) (Statement of Sen. Tunney) ("The amendments will help to achieve the purposes of the bill and will clarify some confusion caused by language remaining in the bill from earlier drafts or omitted from earlier drafts which went unnoticed during the final committee markup.").

Most importantly for our *Chevron* inquiry, there is nothing to suggest that Congress chose the definition it did in order to *exclude* habitat modification. The Committee may have rejected the S. 1983 definition only because it apparently would have made habitat modification a *per se* violation of the ESA, as opposed to leaving such determinations to the discretion of the responsible agency whose judgment this court today casts aside. Surely there is nothing to indicate that the Committee intended to foreclose an administrative regulation prohibiting habitat modification—particularly a prohibition accompanied by limitations, such as those contained in the FWS regulation under review, requiring that there be actual injury or death to wildlife.

In any case, Congress manifested no clear intent to exclude habitat modification from the "take" definition. Indeed, the Senate Committee Report states that " 'Take' is de-

fined ... in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S.Rep. No. 93–307, 93rd Cong., 1st Sess. 7 (1973), 1973 U.S.C.C.A.N. p. 2995. And, as I have noted above, the bill reported out of Committee did not even include the word "harm" in the definition of "take." That was added later on the floor, in a "technical and clarifying amendment[ ]." 119 Cong.Rec. 25,682–83 (July 24, 1973) (Statement of Sen. Tunney). As the amendment added the word "harm," while subtracting nothing, that amendment can only have broadened the definition from the bill reported out of Committee—"clarifying" that "take" should be defined "in the broadest possible manner."

The contention that Congress intended land acquisition to be the exclusive instrument for curbing habitat modification on private lands is totally speculative. Nothing in the language of 16 U.S.C. § 1534 or in the legislative history proves this sweeping assertion. The only evidence the majority can garner in support of its proposition is a few isolated and ambiguous remarks by members of Congress on the floor. *See* 119 Cong.Rec. 25,669 (July 24, 1973) (Statement of Sen. Tunney); 119 Cong.Rec. 30,162 (Sept. 18, 1973) (Statement of Rep. Sullivan). The general rule is that "debates in Congress expressive of the views and motives of individual members are not a safe guide ... in ascertaining the meaning and purpose of the law-making body." *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 474, 41 S.Ct. 172, 179, 65 L.Ed. 349 (1921). In any case, these statements do not establish that even the speakers themselves intended land acquisition to be the *exclusive* protective mechanism for habitats on private lands.

In sum, the majority has found nothing in the language, structure, purpose, or legislative history that unambiguously shows that "harm" does not encompass habitat modification. Under *Chevron*, that should dispose of the case: the FWS's gap-filling measure is a permissible exercise of its discretion as delegated by Congress. Moreover, not only is the majority's evidence ambiguous, but there is additional evidence supporting the *agen-*

*cy's* interpretation. I have already cited the Senate and House Committee Reports, which suggest that Congress envisioned a broad interpretation of "take," even before the crucial word "harm" was added to the definition of that term. S.Rep. No. 93–307, 93rd Cong., 1st Sess. 7 (1973), 1973 U.S.C.C.A.N. p. 2995 (" 'Take' is defined ... in the broadest possible manner."); H.R.Rep. No. 93–412, 93rd Cong., 1st Sess. 15 (1973) (ESA "includes, in the broadest possible terms, restrictions on the taking, importation and exportation, and transportation of [endangered] species, as well as other specified acts"); *id.* at 11 ("Harass" includes activities of birdwatchers "where the effects of those activities might disturb the birds and make it difficult for them to hatch or raise their young."). And I have adverted to the floor amendment that added the word "harm," purportedly to "clarify" language that was "omitted" from the draft that emerged from Committee. 119 Cong.Rec. 25,683 (July 24, 1973) (Statement of Sen. Tunney).

In addition, the agency's interpretation draws support from a subsequent amendment to the ESA. In 1982, Congress amended the ESA to include a provision authorizing the FWS to issue a permit allowing "any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). By negative inference, this provision demonstrates that Congress thought at least some "incidental takings" must be prohibited by § 1538(a)(1)(B) in the first instance. The majority speculates on what Congress could have meant by "incidental takings," but the evidence quite clearly suggests that Congress meant habitat modification. The House Report states,

> This provision is modeled after a habitat conservation plan that has been developed by three Northern California cities, the County of San Mateo, and private landowners and developers to provide for the conservation of the habitat of three endangered species....
>
> This provision will ... provide the institutional framework to permit cooperation

between the public and private sectors in the interest of endangered species and habitat conservation.

H.R.Rep. No. 97–835, 97th Cong., 2d Sess. 30–31 (1982), 1982 U.S.C.C.A.N. pp. 2871, 2872.

Moreover, the 1982 amendments came *after* the Secretary promulgated the present definition of "harm" at issue in this case. But instead of using the amendments as an occasion to overrule the Secretary's interpretation, Congress chose to allow the definition of "take" to stand, while amending another section of the statute—making clear in the process that it knew habitat modification could be (and was being) prohibited under the ESA. *See Lindahl v. Office of Personnel Management,* 470 U.S. 768, 782 n. 15, 105 S.Ct. 1620, 1629 n. 15, 84 L.Ed.2d 674 (1985) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280 (1975) (same); *Johnson v. Transportation Agency,* 480 U.S. 616, 629 n. 7, 107 S.Ct. 1442, 1450 n. 7, 94 L.Ed.2d 615 (1987) (congressional inaction after interpretation may be probative of approval).

Judge Williams devotes a large portion of his majority opinion to a refutation of this argument. I presume the reason for this emphasis is that he concurred in the initial panel opinion in this case solely on the ground that the 1982 amendments "support the inference" that the prohibition of takings includes a prohibition of some habitat modification. 1 F.3d at 11 (Williams, J., concurring). Having placed all of his eggs in that basket, he understandably finds it necessary to explain his error at length now that he has changed his mind.

I agree that Judge Williams was wrong the first time. He was wrong to rely solely on the 1982 amendments for his decision; I agree that they do not alone support its weight. They indicate that Congress in 1982 probably believed that habitat modification was properly covered by the prohibition on takings. Admittedly, the 1982 amendments prove little about Congress's intent in 1973,

and had Congress in 1973 specifically stated that "take" does not include habitat modification the 1982 amendments would not save the FWS regulation. But Congress did no such thing in 1973; it was silent on the question. Consequently, the 1982 amendments do lend some weight to the reasonableness of the agency's definition—if Congress in 1982 believed the definition was reasonable, and the agency believed it was reasonable, then *Chevron* demands that we uphold the regulation unless we find solid evidence to the contrary. No such evidence exists.

Thus the court today moves from wrong to more wrong in attempting to parse this statute. Having forsaken the 1982 amendments as dispositive evidence, no effort is made to determine whether the agency could reasonably have relied on such amendments as persuasive evidence supporting its interpretation. Instead, the agency is asked to prove that the best interpretation of "harm" encompasses habitat modification. Beginning from a wrong premise, applying a wrong standard, it is not surprising that the wrong result is achieved.

Overall, there is nothing in the ESA itself, or in its legislative history, that unambiguously demonstrates that the term "harm" in the definition of "take" does not encompass habitat modification. Indeed, there is evidence to the contrary. *Chevron* commands that we defer to an agency's interpretation of a statute it is entrusted to administer, unless that interpretation is contrary to Congress's unambiguous command or an unreasonable exercise of Congress's vague or ambiguous delegation. The majority has not been so quick to ignore *Chevron* before. *See, e.g., Railway Labor Executives' Ass'n v. National Mediation Bd.,* 988 F.2d 133, 144–45 (D.C.Cir.) (Williams, J., dissenting) ("legislative silence [is] precisely the condition that under *Chevron* is understood to create a gap to be filled by the agency."), *vacated on motion for rehearing,* 996 F.2d 1271 (D.C.Cir.1993). Neither should it ignore *Chevron* today.

Finally, the majority should be even more hesitant to cast aside the agency's interpretation in light of the circuit split that this decision now creates. The Ninth Circuit determined, in *Palila v. Hawaii Dep't of Land and Natural Resources,* 852 F.2d 1106 (9th Cir.1988), that the FWS's "harm" definition was a permissible interpretation of the statute. "The Secretary's inclusion of habitat destruction that could result in extinction follows the plain language of the statute because it serves the overall purpose of the Act, which is 'to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved....' 16 U.S.C. § 1531(b)." *Id.* at 1108. The purpose of the Endangered Species Act, lest we forget, is to protect endangered species. In today's abandonment of our decision of less than a year ago, this court takes a large step backward from that purpose. The majority may believe it is making good policy—but that is not our job. Under *Chevron,* we may overturn an administrative regulation only if it contradicts the agency's legislative mandate. Congress does not always speak as plainly as it might in designing administrative missions for the executive branch, so it is not always easy to decipher Congress's marching orders to an agency. But at least we ought to try. I dissent.